BAYSIDE ENTERPRISES, INC., et al.

v.

Dale CARSON et al.

ELLWEST STEREO THEATRES, INC.,
a Florida Corporation,

v.

CONSOLIDATED CITY OF
JACKSONVILLE et al.

Nos. 77–633–Civ–J–M, 77–653–Civ–J–M.

United States District Court,
M. D. Florida,
Jacksonville Division.

May 18, 1978.

Norman J. Abood, Jacksonville, Fla., for plaintiff Bayside Enterprises, et al., in case no. 77–633–Civ–J–M.

William J. Sheppard, Jacksonville, Fla., for plaintiff Ellwest Stereo Theatres, Inc., in case no. 77–653–Civ–J–M.

Eve Peck, Asst. Gen. Counsel, City of Jacksonville, Jacksonville, Fla., for defendants Consolidated City of Jacksonville and Dale Carson.

Frank Tassone, Jr., Asst. State Atty., Jacksonville, Fla., for defendant T. Edward Austin.

## OPINION AND ORDER DECLARING CERTAIN PROVISIONS OF THE JACKSONVILLE ADULT ENTERTAINMENT CODE CONSTITUTIONAL, CERTAIN OTHER PROVISIONS UNCONSTITUTIONAL, AND PARTIALLY GRANTING REQUESTED INJUNCTIVE RELIEF

MELTON, District Judge.

These cases are before the Court for final judgment on a complaint alleging the unconstitutionality of a recently-enacted Jacksonville ordinance that seeks to regulate a wide range of businesses designated by the ordinance as "Adult Entertainment and Services." The plaintiffs are four corporations and one individual who operate businesses that would be subject to regulation under the ordinance.[1] The defendants are the City of Jacksonville and various Jacksonville officials, sued in their official capacities, who are charged with enforcement responsibilities under the ordinance. As a basis for this Court's jurisdiction, the plaintiffs invoke the substantive provisions of 42 U.S.C. § 1983, and its jurisdictional counterpart, 28 U.S.C. § 1343 (1976); the plaintiffs also request declaratory relief under 28 U.S.C. § 2201 (1976).

The ordinance in question is a comprehensive enactment that makes two basic changes in the Jacksonville Municipal Code. First, the ordinance adds to the Municipal Code a new chapter, Chapter 410, styled the "Adult Entertainment and Services Code," that imposes a broad regulatory scheme (in the form of a licensing system) upon various businesses that operate in the adult entertainment field, including adult bookstores and motion picture theaters. Second, the ordinance amends certain provisions of the Jacksonville Zoning Code purportedly to provide for the geographic dispersal of adult entertainment establishments. Hereinafter the Court will refer to both parts of the ordinance as the "Adult Entertainment Code", or more simply as "the Code."

## ABSTENTION

Initially, the defendants (hereinafter the City) assert that this Court should dismiss this suit under the doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny.[2] Although ad-

---

1. Although the complaints in these two cases were filed separately, their allegations are substantially identical. With no objection, the Court consolidated the cases for trial and disposition pursuant to Rule 42(a), Fed.R.Civ.P.

The sole plaintiff in case number 77–653–Civ–J–M is Ellwest Stereo Theaters, Inc., a Florida corporation that operates theaters containing booths for the exhibition of "adult-only" motion pictures. In case number 77–633–Civ–J–M, there are three corporate plaintiffs: Bayside Enterprises, Inc., and Panama Books, Inc., both of which operate various local bookstores that market adult books and magazines and that exhibit adult films; and Royal Enterprises Investment Corp., the owner-operator of a local movie house that displays adult films. In addition to the corporate plaintiffs, case 77–663–Civ–J–M was bought by an individual, Bobbie Paul Miles, who owns and oper-

ates several local cocktail lounges that feature "topless" dancing and thus would be subject to regulation under the ordinance.

In their complaint, the plaintiffs in the *Bayside Enterprises* case expressed a desire to proceed with their case as a class action under Rule 23, Fed.R.Civ.P. This aspect of the *Bayside* case was withdrawn, however, on the oral motion of the plaintiffs' attorney.

2. In addition to *Younger's* companion case, *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), and *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971), *see, e. g., Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct.

mitting that no criminal prosecutions under the Code are now pending in the state courts, the City nonetheless asserts that *Younger* principles of "comity and federalism" dictate that the Court dismiss this case.

■ At least insofar as the City's *Younger* argument pertains to adult bookstores and movie houses, it is unpersuasive. As previously noted, the City has not called to the Court's attention any prosecution, civil or criminal, presently pending in state court that would adjudicate the constitutional rights of adult bookstore and motion picture proprietors under the Code. To the extent that the plaintiffs seek an adjudication of their rights as operators of adult bookstores and movie houses, then, the absence of pending state proceedings renders *Younger*-type dismissal inappropriate. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 930, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Concerned Citizens of Vicksburg v. Sills,* 567 F.2d 646 (5th Cir. 1978).

Insofar as the City requests that this Court abstain from ruling on the constitutionality of the Code's application to "topless" cabarets, however, a different question is presented. One of the plaintiffs in case number 77–633–Civ–J–M, Bobbie Paul Miles, is presently litigating in the state courts the constitutionality of the Code's provisions governing topless dancing establishments. The state court has, in fact, granted plaintiff Miles an injunction *pendente lite* against the enforcement of the Code's topless dancing restrictions, and as far as this Court's records indicate, the state case is still under active consideration at the trial stage. Although the state case will not involve any other Code provisions, its existence does mitigate against this Court's exercise of its jurisdiction to adjudicate the claims, raised by Mr. Miles, against the Code's regulation of topless cabarets. Under the circumstances, the posture of plaintiff Miles' claims before this Court is indistinguishable from that of the plaintiff

in *Cornwell v. Ferguson,* 545 F.2d 1022 (5th Cir. 1977), wherein the federal plaintiff "freely and voluntarily chose to first seek relief from the state court." *Id.* at 1024. *See also Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). Accordingly, this Court's adjudication on the merits of this case will exclude any consideration of the Code's provisions governing topless dancing establishments. In all other respects, *Younger* abstention is inappropriate. With this preliminary matter disposed of, then, the Court now turns to the merits of the plaintiff's claims.

## RESIDENCY REQUIREMENTS

■ In section 410.204(a), the Code requires that in order to be eligible for a license, an applicant must be (*inter alia*) a resident of the city. When the applicant is a partnership, a majority of the general partners must reside in the city; similarly, for corporate applicants a majority of the "officers, directors and principal stockholders" must reside locally. Additionally, section 410.404(a) requires that all employees of a licensed operation be local residents. In its post-trial brief, the City has conceded the unconstitutionality of the Code's residency requirements; accordingly, those provisions are hereby declared unconstitutional, and their enforcement will be enjoined.

## ZONING

The City seeks to justify its zoning scheme under the rationale of the Supreme Court's decision in *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). In *Young,* the Court upheld a zoning scheme enacted by the City of Detroit to regulate the geographical placement of "adult" bookstores and motion picture theaters, as well as topless cabarets, within the city. Like Jacksonville's Adult Entertainment Code, the Detroit ordinance prescribed a plan of "inverse zoning": rather than concentrating the particular type of land use (i. e., adult entertainment) within a

---

1200, 43 L.Ed.2d 482 (1975); *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). *See also* Laycock, *Federal Interference*

*with State Prosecutions: The Need for Prospective Relief,* 1977 Sup.Ct.Rev. 193.

given geographical area, Detroit opted to disperse this type of establishment throughout the city. Toward this end, Detroit established a category of "regulated uses" that included adult theaters and bookstores.[3] The city then prohibited more than two such uses within 1,000 feet of each other. Additionally, Detroit prospectively banned the establishment of any adult theater or bookstore, or of any topless cabaret, within 500 feet of any area zoned for residential use.[4]

Although the Supreme Court upheld the Detroit zoning scheme against constitutional attack, the Court disagreed on the method of analysis by which that result should be reached. Writing for a four-member plurality, Mr. Justice Stevens initially observed that the Detroit ordinance did not impose an invalid prior restraint on protected speech, since access to the adult entertainment market was not foreclosed either for purveyors or for consumers of adult entertainment material.[5] As he observed, "Viewed as an entity, the market for this commodity is essentially unrestrained." *Id.* at 62, 96 S.Ct. at 2448. Thus, apart from the fact that adult entertainment establishments received discrete, content-based treatment under the Detroit ordinance, the

locational requirements of that ordinance did no more than impose a reasonable "time, place, or manner" restriction on the dissemination of adult entertainment materials. *Id.* at 63, 96 S.Ct. 2440.

The real problem, as the plurality saw it, was whether the Detroit ordinance could withstand scrutiny under the fourteenth amendment's equal protection clause. Although the plurality did not explicitly articulate the mode of equal protection scrutiny it was applying, it noted that society's interest in protecting sexually explicit material "is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate. . . ." *Id.* at 70, 96 S.Ct. at 2452. Additionally, it observed that Detroit's zoning scheme was not constitutionally infirm merely by virtue of the fact that it imposed a system of content-based regulation of speech; since the content-based classification obtained regardless of the *message* communicated through a particular film or book, Detroit had not offended "the Government's paramount obligation of neutrality in its regulation of protected communication." *Id.* Thus, the plurality held, a government may legitimately use the content of sexually explicit

---

**3.** In addition to adult bookstores and movie houses, "regulated uses" under the Detroit ordinance included "group D" cabarets; cocktail lounges; hotels and motels; pawnshops; pool halls; public lodging houses; secondhand stores; shoeshine parlors; and taxi dance halls. *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 52 n. 3, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

**4.** Initially, the Detroit ordinance had proscribed the operation of any adult bookstore or theater, or of any topless bar, within 500 feet of "any building containing a residential, dwelling or rooming unit." When the district court decided *Young* and its companion cases, it held that this particular 500-foot restriction was unconstitutional. In the district court's view, the 500-foot restriction imposed too severe a limitation upon the number of locations where the regulated businesses could operate. As the court stated, "There are few, if any, locations other than industrial areas and the downtown commercial area of Detroit where there is not a single dwelling or living unit within 500 feet." *Nortown Theatre Inc. v. Gribbs,* 373 F.Supp. 363, 370 (E.D.Mich.1974). Rather than appeal that ruling, Detroit amended its ordinance to

proscribe the location of adult establishments within 500 feet of areas zoned for residential use. When the case reached the Supreme Court, Detroit's amended version of the 500-foot restriction was the operative legislation. *Young,* 427 U.S. at 52 n. 2, 96 S.Ct. 2440.

**5.** This portion of Mr. Justice Stevens' opinion—Part II—expresses the view of a five-member majority of the Court. Mr. Justice Powell joined in all but Part II of the Stevens opinion, discussed *infra.*

Analytically, Mr. Justice Stevens' point regarding access to the adult entertainment market is a crucial one. Since Detroit had not restricted the availability of the adult entertainment market itself, the plan did not, in Justice Stevens' view, impose a prior restraint upon the exercise of free speech. Thus, the Stevens opinion escaped the necessity of treating the plethora of cases, *e. g., Blount v. Rizzi,* 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), that impose tight procedural safeguards upon administrative systems of prior restraint or censorship.

materials as a basis for classifying and regulating those materials as a separate category of expression. From that proposition, the plurality went on to hold that since Detroit had both a valid interest in promoting the quality of urban life and a "factual basis" for concluding that its zoning scheme would further that interest, Detroit could constitutionally regulate the geographical placement of adult entertainment establishments within its jurisdiction. *Id.* at 71–73, 96 S.Ct. 2440. But as the plurality pointed out, the only real issue presented by *Young* was whether Detroit could control the location of adult entertainment establishments; in a footnote, the plurality stated that "[t]he situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech." *Id.* at 71 n.35, 96 S.Ct. at 2453.

Mr. Justice Powell concurred with the result reached by the plurality, but disagreed with its analysis of the equal protection problem. The Powell concurrence initially expresses some reservation with the plurality's view that nonobscene but sexually explicit materials may be accorded a degree of first amendment protection different from that which cloaks other forms of protected expression. *Id.* at 73 n.1, 96 S.Ct. 2440. Instead of analyzing the problem from a pure equal protection standpoint, Mr. Justice Powell focuses first on the traditionally broad power of local municipalities to regulate land use through the mechanism of zoning. Against that background, the Powell concurrence goes on to examine the Detroit zoning plan and its effects on various first amendment interests, concluding that the ordinance's impact on those interests is only "incidental and minimal" since "Detroit has silenced no message, has invoked no censorship, and has

imposed no limitation" upon access to adult materials. *Id.* at 78, 96 S.Ct. at 2456. Turning then to the *United States v. O'Brien* test for the constitutionality of incidental first amendment restrictions[6], Mr. Justice Powell concludes that all four elements of that test are satisfied by the Detroit ordinance. *Id.* at 80–82, 96 S.Ct. 2440. For that reason, he joins in the plurality's conclusion that the ordinance is constitutional.

■ Under the facts of the instant case, this Court concludes that the zoning prescriptions of Jacksonville's Adult Entertainment Code cannot withstand constitutional scrutiny under the Supreme Court's *Young* analysis. The relevant distance limitations in the Adult Entertainment Code are set forth in section 708.1202, which provides as follows:

> No adult entertainment or service facility shall be located in any site unless such site is not less than the distance limitations as required by this section:
>
> (a) Two thousand five hundred feet from the location of any church or school;
>
> (b) Two thousand five hundred feet from the location of another such adult entertainment or service facility; and
>
> (c) Five hundred feet from the boundary line of any residential district.

Obviously, these distance requirements are facially more restrictive than those prescribed by the Detroit ordinance. Although requirement (c) is identical to one of Detroit's provisions, requirements (a) and (b) are substantially more stringent than anything in the Detroit scheme, which contained no distance limitations relating to churches or schools and which allowed up to two "regulated uses" within one thousand feet of each other.[7] That the Jacksonville

---

6. Under the criteria established in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), an incidental restriction on expression protected by the first amendment is permissible:

> if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the sup-

pression of free expression; and if the incidental restriction on alleged First Amendment freedoms, is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. at 1679.

7. Additionally, Detroit's ordinance contained a provision whereby the zoning authorities could waive the distance limitation in specific cases where that restriction would not further the

distance limitations are more burdensome than Detroit's does not, of course, in itself render them invalid. The critical inquiry is the *effect* the limitations have on the exercise of first amendment rights.

At the evidentiary hearing before this Court, the plaintiffs introduced into evidence a scale map of Jacksonville published by the United States Geological Survey. A witness for the plaintiffs, Ms. Janine Yunker, testified that from each point on the map that indicated the presence of a church or school, she had marked a perimeter with a scale radius of 2500 feet to indicate the areas within which the Jacksonville zoning scheme would prohibit the location of adult entertainment facilities. This exhibit graphically illustrates that the zoning plan as it now stands would effect, for all practical purposes, a total ban on the establishment of new adult bookstores or movie houses.[8]

In the Court's view, this fact more than amply distinguishes the Jacksonville zoning scheme from the type of permissible inverse zoning approved in *Young*. In its practical effect, the Jacksonville ordinance precludes access to the market in adult materials by anyone other than those who now market those materials in their present business locations.[9] Under both the plurality and specially concurring opinions in *Young*, this

denial of access to the adult entertainment market would eliminate a crucial underpinning of the analysis by which the Court sustained the validity of Detroit's zoning scheme. In its scrutiny of the content-based classification of expression under the Detroit ordinance, the plurality emphasized that Detroit had not denied anyone future access to the adult entertainment market. If Detroit had done so, the plurality stated that it would be faced with a "quite different" situation, and went on to quote the *Young* trial court's finding that "the Ordinances do not affect the operation of existing establishments but only the location of new ones. There are myriad locations in the City of Detroit which must be over 1000 feet from existing regulated establishments." *Id.* at 71–72 n.35, 96 S.Ct. at 2453, quoting *Nortown Theatre, Inc. v. Gribbs*, 373 F.Supp. 363, 370 (E.D.Mich.1974). Given the clear opportunity for free dissemination and consumption of adult fare, the only question was whether Detroit's separate classification, for zoning purposes, of that form of expression could be justified by the city's interest in eliminating the undesirable effects which accompanied the geographic concentration of adult entertainment businesses. In the plurality's view, *Young* simply was not a suppression-of-speech case. Since the Jacksonville ordinance *does* effec-

---

purposes of the ordinance. *Young*, 427 U.S. at 54 n.7, 96 S.Ct. 2440. No such waiver provision appears in the zoning portion of Jacksonville's Adult Entertainment Code.

**8.** This map, Plaintiffs' Exhibit 12, was admitted into evidence over the city's objection. The Court allowed the exhibit's introduction for two reasons. First, the authenticity of the map is not subject to serious challenge; in fact, the map probably qualifies as a self-authenticating publication under Fed.R.Ev. 902. Second, under Fed.R.Ev. 201, the Court may judicially notice geographical distances and locations, *see United States v. Alvarado*, 519 F.2d 1133, 1135 (5th Cir. 1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1107, 47 L.Ed.2d 315 (1976), and to a great extent the plaintiffs' map serves solely to illustrate cartographically facts that are otherwise subject to judicial notice.

The City's chief complaint with Exhibit 12 is that the map was prepared in 1970, while the Code will establish present limitations on the location of adult entertainment establishments.

Of course, this objection goes merely to the probative weight of Exhibit 12, and not to its admissibility. For the record, the eight-year time lag between the publication of the map and the time of trial did not substantially lessen its probative value before this Court. It is doubtful that the location of this city's churches and schools has changed appreciably over the last eight years. Moreover, the 2500-foot radii drawn by witness Yunker overlap to such an extent that it is inconceivable that normal geographic changes would materially lessen the map's probative value.

**9.** The Code's zoning system does contain a "grandfather" clause allowing currently-operating establishments to continue in their present locations notwithstanding the Code's distance requirements. Adult Entertainment Code § 708.1205. For the purposes of this case, it is uncontested that the plaintiffs desire to disseminate materials at places other than, and perhaps in addition to, their present business locations.

tively bar future access to the adult entertainment market, it obviously cannot be sustained under the analysis employed by the *Young* plurality.

It is even clearer that the Jacksonville ordinance could not be upheld under the analysis articulated in Mr. Justice Powell's special concurrence. The Powell concurrence turns on the thesis that Detroit's ordinance imposed only a "minimal and incidental" restriction on first amendment interests; as the opinion points out, "there is no indication that the application of the [Detroit] ordinance to adult theaters has the effect of suppressing production of or, to any significant degree, restricting access to adult movies." *Id.*, 427 U.S. at 77, 96 S.Ct. at 2455. With the Jacksonville ordinance, of course, the suppressive effects of the zoning scheme are readily apparent since, aside from those who presently do so, no one will be allowed a forum through which to disseminate sexually explicit (though presumably nonobscene) forms of expression. Under the circumstances, the effects of the Jacksonville zoning scheme upon first amendment interests clearly cannot be regarded as minimal or incidental.

As Mr. Justice Powell's opinion in *Young* warns, "courts must be alert to the possibility of direct rather than incidental effect of zoning on expression, and especially to the possibility of using the power to zone as a pretext to suppressing expression . . ." *Id.* at 84, 96 S.Ct. at 2459. The *Young* Court recognized that a municipality's interest in eliminating the undesirable effects which may accompany the types of businesses at issue here is a valid one, and this Court fully sympathizes with Jacksonville's efforts in that direction. Undoubtedly, the passage of this ordinance was not intended to suppress constitutionally protected forms of expression; nevertheless, the implementation of this ordinance would have that effect. As it now exists, Jacksonville's zoning scheme cannot withstand the close scrutiny which the courts must apply to laws which implicate first amendment rights. If the city elects to revise these distance limitations, such revisions will have to be done so that geographical placement, rather than

access in itself, is the only restriction which the city effectively imposes. As with any enactment implicating free expression, of course, the burden of justifying any revised zoning plan will be with the city. *See, e. g., Bayou Landing, Ltd. v. Watts,* 563 F.2d 1172 (5th Cir. 1977), *petition for cert. filed,* 46 U.S.L.W. 3633 (March 29, 1978).

## LICENSING

■ Jacksonville's Adult Entertainment Code establishes a comprehensive system of licensing, and prohibits the operation of any adult entertainment facility without first obtaining a license. Adult Entertainment Code § 410.203. Thus, as to those areas of adult entertainment which are protected by the first amendment from governmental restriction, the Code effectuates a prior restraint. Although systems of prior restraint are not unconstitutional per se, *e. g., Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), they are said to bear a "heavy presumption" against their constitutional validity. *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). As the Court has recently stated,

The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

*Southeastern Promotions,* 420 U.S. at 558–59, 95 S.Ct. at 1246.

In the Jacksonville licensing scheme, there are two chief problem areas challenged by the plaintiffs. First there is the Code's fee system, which levies substantial fees on businesses seeking to obtain a

license under the Code.[10] Second, the plaintiffs mount a broad-based attack on the administration and enforcement provisions of the licensing system, asserting that officials charged with executing the Code's provisions are granted too much discretionary power in that capacity, and that this problem is exacerbated by the Code's lack of procedural guaranties of prompt judicial review of the officials' actions.

*A. License Fees*

 In the area of purely economic legislation, a governmental authority with the power to levy fees and taxes may exercise that power with little constitutional restraint. Even where a government imposes taxes which demonstrably render a business unprofitable, such taxes generally raise no issue of constitutional magnitude. "The premise that a tax is invalid if so excessive as to bring about the destruction of a particular business . . . ha[s] been 'uniformly rejected as furnishing no juridical ground for striking down a taxing act.'" *City of Pittsburg v. Alco Parking Corp.,* 417 U.S. 369, 374, 94 S.Ct. 2291, 2295, 41 L.Ed.2d 132 (1974), *quoting Magnano Co. v. Hamilton,* 292 U.S. 40, 47, 54 S.Ct. 599, 78 L.Ed. 1109 (1934). When taxing legislation impacts only upon economic interests, the fifth amendment's "taking" clause will usually provide the only colorable grounds for constitutional attack, and the taxing authority may exercise a broad range of powers consistent with that constitutional provision.

 On the other hand, when a governmental authority imposes fees or taxes which implicate rights we deem "fundamental", a much stricter variety of judicial scrutiny is mandated. *See, e. g., Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974). In the area of first amendment rights, in fact, taxes as such are plainly unconstitutional, since "a state may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania,* 319 U.S. 105, 113, 63 S.Ct. 870, 875, 87 L.Ed. 1292 (1943). The rationale of this rule is obvious; as the Supreme Court has stated, "the power to impose a license tax on the exercise of [first amendment] freedoms is indeed as potent as the power of censorship . . . ." *Id. See also Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936).

 This is not to say, however, that a governmental authority may not impose some financial burden incidental to the exercise of first amendment rights. *See Grosjean,* 297 U.S. at 250, 56 S.Ct. 444. The Constitution will tolerate a licensing fee so long as it is a "nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question." *Murdock,* 319 U.S. at 113–14, 63 S.Ct. at 875. Thus, courts have upheld such licensing fees as a $5 processing charge on daily permits to operate sound amplification devices, *United States Labor Party v. Codd,* 527 F.2d 118 (2d Cir. 1975), and an administrative fee of $3 per thousand feet on films to be screened under a municipal film preview program. *Universal Film Exchanges, Inc. v. City of Chicago,* 288 F.Supp. 286 (N.D.Ill. 1968). *See also Star v. Preller,* 352 F.Supp. 530 (D.Md.1972) (three-judge court), *vacated,* 413 U.S. 905, 93 S.Ct. 3054, 37 L.Ed.2d

10. The licensing fees are contained in Adult Entertainment Code § 410.214(a), which provides in full:

(a) *Levy of Fees.* There are hereby levied the following annual license fees under this chapter:

(1) adult bookstore—one thousand two hundred dollars.

(2) adult massage parlors—one thousand dollars.

(3) adult motion picture theaters, as follows:

(i) having only adult motion picture booths—one hundred dollars for each booth; or

(ii) having only a hall or auditorium—ten dollars for each seat or place; or

(iii) designed to permit viewing by patrons seated in automobiles—ten dollars for each speaker or parking space; or

(iv) having a combination of any of the foregoing—the license fee applicable to each under subparagraphs (i), (ii) and (iii).

(4) adult dancing establishment—one thousand two hundred dollars.

Moreover, under section 410.205(b), any application for a license under the Code must be accompanied by a $500 application fee.

1016 (1973). In the context of a state's parade permit statute, the Supreme Court has upheld a fee system which levied charges ranging from a nominal sum to a maximum of $300. *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). And the court of appeals for this circuit has upheld a municipal film licensing scheme which levied a $25 application fee and a $10 renewal fee, noting that the fees were imposed solely to defray the expense of an otherwise valid licensing procedure. *Chemline, Inc. v. City of Grand Prairie,* 364 F.2d 721 (5th Cir. 1966).

In each of the cases sustaining licensing fees against first amendment attack, the licensing authority had been able to demonstrate that the fees were necessary to cover the reasonable costs of the licensing system, and that the fees were used for no other purpose than to meet those costs. Where the licensing authority cannot or does not meet its burden of proof on these issues, the licensing fees have been held to constitute invalid prior restraints on free speech. For example, where the evidence showed that a Connecticut statute charging a $35 registration fee for lobbying activities produced revenues in excess of the costs of administering the statute, a three-judge district court held the statute invalid. *Moffett v. Killian,* 360 F.Supp. 288 (D.Conn.1973). And in a "sound truck" case in which the licensing officials had submitted no evidence to justify the $25 fee for the appropriate permit, the district court held that it had "no alternative" other than to declare the fee invalid. *NAACP v. Chester,* 253 F.Supp. 707, 714 (E.D.Pa.1966). *See also International Society for Krishna Consciousness of Western Pennsylvania, Inc. v. Griffin,* 437 F.Supp. 666 (W.D.Pa.1977) ($10 daily permit fee for solicitation at airport held unconstitutional). The question before the Court in the instant case, then, is whether the City adduced evidence sufficient to demonstrate its need to charge the Code's substantial licensing fees purely in order to meet the reasonable expenses which the City can expect to incur in administering the licensing scheme.

In the opinion of the Court, the city's proof fell short of the mark. On direct examination, the City's witnesses did establish a projected administrative cost of $281,400.00 for the first year of enforcement, with costs of approximately $202,280.00 for each year thereafter. These figures were based on a projected need for annual manpower on the order of two police sergeants, ten full-time officers, one secretary, and two clerk-typists. Additionally, the City estimated its equipment needs at twelve new automobiles, one camera, one fingerprint set, various filing cabinets, three typewriters, three desks, and three chairs.

 In the Court's view, these projections far exceed what the City could reasonably expect to need when it begins to enforce the Code's licensing provisions. The City's own witnesses indicated that there are thirty-six businesses existing in Jacksonville which could fall within the Code's licensing requirements; thus, as the plaintiffs point out, the personnel projection alone would indicate that the Sheriff intended to assign one full-time law enforcement officer to regulate every three adult entertainment businesses in the City.[11] Although the City's witnesses explained their cost projections in terms of fixed manpower and equipment needs, none of the witnesses was able to tie his particular projections to specific administrative requirements in anything other than a speculative manner. In sum, the City's evidence was simply inadequate to justify the high costs imposed by the Code on those seeking a license to disseminate materials which are presumptively

---

11. Furthermore, it would be unreasonable to assume that the Code's enactment would lead to a rapid growth in the local adult entertainment industry. Prior to the Code, there was virtually no local regulation of adult entertainment facilities as such aside from the City's enforcement of its building and fire code ordinances and of the state laws regulating obscen-ity. The evidence before this Court did not indicate that the adult entertainment business was growing rapidly during its unregulated period. Thus, it would defy common sense for the City to suppose that the advent of local regulation, including a stiff fee system and restrictive zoning scheme, would occasion a higher growth rate in this enterprise.

accorded first amendment protection. Accordingly, this Court must enjoin the enforcement of the City's license fee system, as that system now exists.

## B. License Standards

In addition to the Code's fee system, the plaintiffs challenge the Code's administrative and enforcement provisions. Specifically, the plaintiffs assert that the Code's standards governing the Sheriff's granting of licenses, and his potential suspension or revocation thereof, fall short of constitutional requirements. The Court will herein consider each of the plaintiffs' contentions regarding these alleged substantive defects in the Code's licensing scheme.

The plaintiffs' first complaint in connection with the administrative provisions of the Code's licensing system focuses on the discretionary power vested in the Sheriff to determine whether a particular applicant should be granted a license to operate an adult entertainment establishment. In addition to several specific criteria (discussed *infra*) that the Code sets forth to disqualify particular applicants, the Sheriff is directed to issue licenses "only to individuals of good moral character. . . . ."[12] The plaintiffs contend that this provision is so general in its terms that it allows the Sheriff an impermissible range of discretion in deciding whether to issue a license.

In the Court's view, the plaintiffs' point is well taken. An ordinance that

> makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an

unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*Staub v. City of Baxley,* 355 U.S. 313, 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302 (1958). And in order to violate this principle, a law need not on its face vest with a licensing official absolute discretion, of course; if the articulated standards for the official to apply are vague or general, the spectre of censorship may exist just as clearly as where there are no standards at all. *See Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (ordinance authorizing denial of parade permit in the interests of "public welfare, peace, safety, health, decency, good order, morals or convenience"); *Hannegan v. Esquire, Inc.,* 327 U.S. 146, 66 S.Ct. 456, 90 L.Ed. 586 (1946) (federal statutes authorizing Postmaster General to suspend or revoke second-class mailing privileges if publication was not "for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry"); *Hull v. Petrillo,* 439 F.2d 1184 (2d Cir. 1971) (ordinances requiring vendors' licenses prior to selling newspapers on city streets and directing mayor to issue license "to such persons as he shall deem proper"); *Avon 42nd Street Corp. v. Myerson,* 352 F.Supp. 994 (S.D.N.Y.1972) (ordinance authorizing city commissioner to deny, suspend or revoke motion picture exhibitor's license on the basis of the "character of the applicant" or for violations of public "morality" or "decency"); *People v. Mitchell,* 74 Misc.2d 1053, 346 N.Y.S.2d 495 (Crim.Ct.N.Y.1973) (ordinance requiring permit for the operation of, *inter alia,* coin-operated motion picture booths and authorizing permitting official to apply "the provisions and conditions which, in his judgment, may be

---

12. Adult Entertainment Code § 410.204(a). The pertinent part of this subsection provides in full that "[l]icenses shall be issued only to individuals of good moral character who are not less than eighteen years of age." *Id.* Of course there is no contention that the City is constitutionally compelled to allow minors to disseminate materials which fall under the Code's provisions.

Section 410.204(a) goes on to proscribe the grant of a license to any individual who is not a resident of the City, to any partnership in which the majority of the general partners are not residents of the City, or to any corporation whose officers, directors, and "principal stockholders" are not residents of the City. As previously noted, counsel for the City has conceded that this residency requirement cannot withstand constitutional scrutiny.

essential for the welfare and benefit of the people and visitors to this city"); *accord, 414 Theatre Corp. v. Murphy,* 360 F.Supp. 34 (S.D.N.Y.1973), *aff'd,* 499 F.2d 1155 (2d Cir. 1974). *See also Plematis v. City of Daytona Beach,* 340 F.Supp. 617 (M.D.Fla. 1972). The provision of the Adult Entertainment Code proscribing the issuance of licenses to those applicants who are not, in the opinion of the Sheriff, "of good moral character" is no more definite or specific than the ordinances involved in the cases just cited. As in those cases, the effect of the Code's "good moral character" criterion is to allow the Sheriff to deny a license to whomever he pleases and to legitimatize that action through reference to a criterion which is so imprecise as to be virtually unreviewable. Accordingly, the Court hereby finds this particular provision unconstitutional.

The plaintiffs mount another vagueness attack upon section 410.212(a)(2) of the Code, which gives the Sheriff the authority to suspend or revoke an adult entertainment license when he determines "upon sufficient cause" that "the licensee, his or its agents, officers, servants or employees, maintain or continue to maintain a nuisance on the licensed premises." A companion section—§ 410.212(b)—prescribes in detail the procedures which the Sheriff must follow before suspending or revoking a license, which procedures guarantee licensees a full adversary hearing with counsel and the right to judicial review, through appeal, of the Sheriff's decisions. The plaintiffs do not directly attack the procedural mechanism implementing the "nuisance" provision; rather, they urge that section 410.212(b)'s nuisance standard, like the Code's "good moral character" provision, is too vague to withstand constitutional scrutiny.

■ In light of the Code's failure to define exactly what constitutes a "nuisance", the plaintiffs' argument appears meritorious at first blush. Two considerations, however, vitiate the necessity of this Court's enjoining the enforcement of the Code's "nuisance" provisions. First, another portion of the Code, section 410.408, provides for the abatement of a licensed premises as a "sanitary nuisance" under the terms of Jacksonville Municipal Code § 500.106. Section 500.106, in turn, authorizes the City's Director of Health, Welfare and Bio-Environmental Services to initiate proceedings in equity on the City's behalf to abate conditions "by which the health or life of another may be seriously threatened or impaired, or by or through which, directly or indirectly, disease may be caused." Clearly, it does not offend the Constitution to require a commercial bookstore or movie theater, like any other business, to maintain conditions of sanitation consistent with the public health. To the extent that the Code merely authorizes the Sheriff to suspend or revoke an adult entertainment license when the licensed premises constitute a "sanitary nuisance", it is unquestionably valid. *Cf. Chemline, Inc. v. City of Grand Prairie, supra.*[13]

13. By the same token, the various construction requirements contained in the Code for reasons of public health and safety are valid. These provisions are not aimed at suppressing speech, nor has there been any demonstration that they would have that effect. Since the construction standards can be segregated from the first amendment aspects of this case, the City need only demonstrate that those standards are reasonably designed to further a legitimate municipal interest. Under that variety of judicial scrutiny, the construction standards clearly pass constitutional muster. *See Chemline, Inc. v. City of Grand Prairie,* 364 F.2d 721, 728 (5th Cir. 1966).

One group of quasi-constructional requirements, however, raises a different issue. The Code imposes certain restrictions upon the types and sizes of signs that a licensed business may use both on and off its premises. Off-site signs are banned altogether, as are "mobile" signs; on-site signs are restricted as to their size and nature. Adult Entertainment Code § 410.301(c) and (d). These restrictions actually impact upon first amendment interests at two levels: first, the message that the sign itself might carry would be to some extent diminished or, in the case of off-site signs, suppressed altogether; second, the sign restrictions would clearly affect the licensee's freedom to communicate through the dissemination of its publications. Under the Jacksonville Municipal Code, no other businesses seem to have their advertising capabilities restricted in this fashion.

Second, this Court notes that the Code's provision authorizing the Sheriff to suspend or revoke a license on the grounds that the licensed premises constitute a nuisance *could* be applied in such a manner as to be indistinguishable in its effect from the Florida statutory scheme allowing a state or City attorney to enjoin the operation of certain premises for certain purposes under a nuisance theory. *See* Fla.Stat. § 847.-011(8) (1977). However, the Florida Supreme Court has recently construed the state statute in question to allow injunctive relief against the dissemination of only those materials which have undergone a full-blown judicial determination of their obscenity *vel non. Mitchem v. State ex rel. Schaub,* 250 So.2d 883 (Fla.1971). In *Mitchem,* the Florida trial court had found that a certain adult bookstore constituted a public nuisance under Fla.Stat. § 847.011(8) and had permanently enjoined its entrepreneurs from further operation of the premises. On appeal, the Florida Supreme Court vacated that injunction, stating that "a business involved in the dissemination of publications cannot be declared a nuisance in this manner." *Id.* at 886, *citing Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

As this Court reads *Mitchem,* the Florida Court will not allow the utilization of the Florida nuisance statute to permanently close entire businesses. The dissemination of *specific publications* may be enjoined, but only after those publications have undergone judicial scrutiny and have been found obscene. Facially, of course, the Code's license suspension/revocation procedures are susceptible to an administrative application that *might* be identical in its effect to the type of injunctive order disapproved in *Mitchem.* However, there is no reason for this Court to anticipate that the Sheriff will apply those procedures in a manner inconsistent with *Mitchem,* or that the Florida courts would uphold such actions if he did. The Code provides, in subsection 410.212(c), that in the event that a license is suspended or revoked, the Sheriff may conditionally reinstate the license upon such terms as he may deem appropriate; thus, the Code's suspension/revocation procedure is quite amenable to a method of application that will focus the Sheriff's inquiry upon *specific items* that are, because of their obscene nature, unprotected by the first amendment, and that will allow the Sheriff to abate the dissemination of those items while allowing the licensee to continue to dispense publications that are presumptively entitled to first amendment protection. This type of procedure would not offend the first amendment under either this Court's or the *Mitchem* court's standards. In view of these facts, this Court will not presume that the Code's nuisance standards will be applied in a manner inconsistent with the Constitution. Accordingly, the Court declines to enjoin the enforcement of the Code's nuisance standard at this time; if the standard is on some future occasion applied in an unconstitutional manner, of course, that will be another case.

Finally, the plaintiffs urge that this Court find constitutional infirmity in several specific Code provisions that mandatorily disqualify license applicants under certain circumstances. In particular, section 410.-204(b) declares that no license shall be granted to "any person who has been convicted of a specified criminal act within five years of the date of application." [14] In

Since the Code's advertising restrictions facially implicate first amendment interests, it is the City's burden to justify them. While of course aesthetic considerations may comprise a legitimate basis for the City's legislation, *see Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), the Court would have to balance those interests against any infringement, however incidental it might be, upon rights of expression protected by the first amendment. This balancing process is impossible on the record before this Court. Accordingly, the Court has no choice but to conclude that the Code's advertising restrictions offend the first amendment.

14. Subsection 410.204(b) prescribes similar requirements for partnership and corporate applicants. A partnership is ineligible for a license if any partner, general or limited, has been convicted of a specified criminal act within five years of the date of application. A corporation will be disqualified by such a con-

turn, section 410.103(m) defines "specified criminal act" to include

> any violation of [the Code]; soliciting for prostitution, pandering, prostitution, keeping a house of ill fame, lewd and lascivious behavior, exposing minors to harmful materials, distributing obscene materials, possession of obscene materials, transporting obscene materials or sale or possession of a controlled substance or narcotic; or any felony under the laws of this State, the United States or any other state.

Thus, the Code effectively mandates a five-year ban on the operation of an adult bookstore or movie house in the case of any person who has been convicted of a "specified criminal act". The plaintiffs do not challenge this provision of the Code on vagueness grounds. Rather, they argue that the Constitution will not permit the City to impose these specific substantive restrictions upon the dissemination of adult entertainment materials.

■ In the Court's view, these portions of the Code may raise questions of constitutional significance in an appropriate case.[15] In light of the present grounds for the plaintiffs' attack on these provisions, however, it is unnecessary for the Court to consider such questions at this time. The plaintiffs have not alleged, and the Court has no reason to assume, that these provisions will bar these particular plaintiffs from obtaining a license under the Code. And unlike other portions of the Code previously discussed, these provisions are not at all vague or indefinite. Thus there is no threat of a subjective "chill" in connection with the plaintiffs' exercise of their first amendment rights due to the operation of these particular Code provisions. Accord-

ingly, the somewhat relaxed standing rules which govern first amendment adjudication of vague statutes are inoperative in this particular aspect of the case. Without a definite indication that these plaintiffs will be deprived of their first amendment rights in this connection, this Court will not allow them to challenge the Code provisions in question. For these reasons, the Court will deny the plaintiffs' request for injunctive relief as to section 410.204(b) of the Code.

## PLAINTIFFS' REMAINING CONSTITUTIONAL ARGUMENTS

■ In addition to adult bookstores and motion picture theaters, the Code includes in its category of adult entertainment establishments those businesses that offer for public patronage the service of massage. After defining "adult massage parlors"[16], the Code establishes certain record-keeping and building construction requirements[17] and prohibits the massage of persons by members of the opposite sex.[18] The plaintiffs allege that they are "desirous of, and [wish] to engage in the business of . . . adult massage parlor . . . establishments," and request this Court to enjoin the enforcement of the Code's adult massage parlor provisions on a number of constitutional theories. As they relate to the massage parlor portions of the Code, the plaintiffs contentions can be dismissed without protracted discussion. The court of appeals for this circuit has sustained a similar municipal ordinance in the face of due-process and equal-protection attack, *Tomlinson v. Mayor of Savannah*, 543 F.2d 570 (5th Cir. 1976), and that decision controls the merits

---

viction entered against any of its "officers, directors, or principal stockholders."

**15.** *See Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). *Compare, e. g., Universal Amusement Co., Inc. v. Vance*, 559 F.2d 1286 (5th Cir. 1977), *with Alexander v. City of St. Paul*, 303 Minn. 201, 227 N.W.2d 370 (1975). The *Universal Amusement* case is presently pending before the Fifth Circuit en banc, and its disposition will be likely to settle the issue for this circuit.

**16.** Adult Entertainment Code § 410.103(b).

**17.** *Id.* § 410.303. This section requires, *inter alia*, that a massage parlor maintain a list of its patrons, subject to police inspection, and that a parlor have a specified quantity of dressing room, shower, and locker facilities available for its patrons' use.

**18.** *Id.* § 410.303(e).

of the instant case.[19] Furthermore, to the extent that the plaintiffs' attack on the Code's massage-related provisions is grounded upon any alleged infringement of first amendment rights of expression, that attack is frivolous. In this context, this Court can perceive no communicative characteristics of any substance which would bring massage parlors within the ambit of the first amendment's free speech clause. As against these plaintiffs, then, the Code's provisions governing adult massage parlors will infringe no constitutional rights. Accordingly, the Court's injunction will not reach those aspects of the Code.

 The plaintiffs further contend that all or part of the Code is invalid because of the state legislature's preemption of the field in enacting several statutes pertaining to obscenity and massage parlor regulation. The Court can perceive no federal due process issue in connection with this portion of the plaintiffs' case; rather, the preemption argument would seem to involve only questions of state law. *Brown v. Brannon,* 399 F.Supp. 133, 137 (M.D.N.C.1975); *see also International Harvester Co. v. Kansas City,* 308 F.2d 35 (10th Cir. 1962), *cert. denied,* 371 U.S. 948, 83 S.Ct. 503, 9 L.Ed.2d 498 (1963). The numerous state cases treating preemption arguments generally address the issue only in terms of state law, *e. g., Lancaster v. Municipal Court,* 6 Cal.3d 805, 100 Cal.Rptr. 609, 494 P.2d 681 (1972); *City of Indianapolis v. Wright,* Ind., 371 N.E.2d 1298 (1978), and the federal courts' adjudication of preemption questions in this context similarly invokes state law under principles of ancillary or pendent jurisdiction. *See Colorado Springs Amusements, Ltd. v. Rizzo,* 524 F.2d 571, 577 (3d Cir. 1975); *Chemline, Inc. v. City of Grand Prairie,* 364 F.2d at 728–29. To the extent that the plaintiffs' preemption argument can be construed as a request that this Court invoke its ancillary or pendent jurisdiction to reach the preemption issue, this Court declines to

do so for a number of reasons. First, the Code's efforts to regulate such a broad range of adult entertainment activities makes it extremely difficult to delineate with any precision the scope of its prospective application. Thus, the preemption question will be a far more manageable one in concrete factual situations rather than here, where the plaintiffs ask this Court in effect to presume that the Code will be applied in a manner inconsistent with Florida law. Second, and more important, the preemption question is a paradigm for state court resolution, involving as it does the construction of Florida's statutory law and the City's municipal legislation to determine the area or areas of conflict between the two. Obviously, principles of comity and federalism would strongly dictate a preference for state court adjudication of the matter. Accordingly, the Court declines to reach the preemption question, and this opinion should not be read to express any views on the merits of that issue.

 Finally, the plaintiffs attack on fourth amendment grounds certain provisions of the Code which would allow the Sheriff, as well as building and fire safety officials, to execute warrantless inspections of the premises of license applicants, or of premises that are already licensed, in order to determine license eligibility or to investigate possible Code violations. Although this argument may well raise a question of constitutional magnitude, *compare United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), *and Colonnade Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), *with Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) *and See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), it seems inappropriate for treatment in the present context. Fourth amendment questions are peculiarly suited for adjudication in concrete factual circumstances; absent any showing that

---

19. *See also Kisley v. City of Falls Church,* 409 U.S. 907, 93 S.Ct. 237, 34 L.Ed.2d 169 (1972), *dismissing for want of substantial federal question* 212 Va. 693, 187 S.E.2d 168; *Colorado Springs Amusements, Ltd. v. Rizzo,* 524 F.2d 571 (3d Cir. 1975); *United Health Clubs of America v. Strom,* 423 F.Supp. 761 (D.S.C. 1976) (three-judge court); *Brown v. Haner,* 410 F.Supp. 399 (W.D.Va.1976); *Rogers v. Miller,* 401 F.Supp. 826 (E.D.Va.1975).

the Code's warrantless inspection procedures will operate to chill rights protected by the first amendment, it seems ill-advised for this Court to reach the Code's fourth amendment problems at this time. Consequently, the plaintiffs' request for injunctive relief from the Code's inspection provisions will be denied.

## CONCLUSION

The Jacksonville Adult Entertainment Code reflects considerable effort on the City's part toward improving the quality of its urban life and securing to its citizens an aesthetically attractive environment. These are goals with which this Court has considerable sympathy. At the same time, the City's efforts in this area are bound to affect rights that are fundamental to our justice system, and that this Court has a duty to recognize and honor. There is little doubt that many of the Adult Entertainment Code's objectives can be reached in a manner consistent with constitutional principles; unfortunately, the Code as it now reads does not in its entirety accomplish that end. Accordingly, the Court will enter its order partially granting the plaintiffs' request for a permanent injunction; partially denying that request; and entering a declaratory judgment in accordance with this opinion.

SO ORDERED in Jacksonville, Florida, this 18th day of May, 1978.