BAYSIDE ENTERPRISES, INC., et al.

v.

Dale CARSON, etc.

Charles Grady KELLER and Daytona International, Inc., a Florida Corporation

v.

CONSOLIDATED CITY OF JACKSONVILLE, etc., et al.

Nos. 78–889–Civ–J–M, 78–898–Civ–J–M.

United States District Court,
M. D. Florida,
Jacksonville Division.

May 17, 1979.

Dawson A. McQuaig, General Counsel and Grady W. Martin, Asst. Counsel, Jacksonville, Fla., for defendants Consolidated City and Dale Carson.

Laurence C. Pritchard, Jacksonville, Fla., for defendant T. Edward Austin.

## OPINION

MELTON, District Judge.

These consolidated cases[1] are before the Court for final judgment on the plaintiffs' petitions for declaratory relief and a permanent injunction against enforcement of recently-enacted amendments to the Jacksonville Municipal Code. Specifically, the case involves a new chapter to be added to the municipal code, Chapter 410, styled the "Adult Entertainment and Services Code" (hereinafter referred to as "the Adult Entertainment Code", or more simply as "the Code"). This municipal legislation attempts to impose a broad regulatory system upon local businesses that operate in the adult entertainment field; these particular plaintiffs offer for public consumption adult-oriented, sexually explicit books, magazines and films.[2] Jurisdiction is grounded upon the substantive provisions of 42 U.S.C. § 1983 (1976) and its jurisdictional counterpart, 28 U.S.C. § 1343 (1976), and declaratory relief is requested under 28 U.S.C. § 2201 (1976).

A prior version of this legislation was before this Court a year ago in *Bayside Enterprises, Inc. v. Carson,* 450 F.Supp. 696 (M.D.Fla.1978) (hereinafter *"Bayside I"*). In *Bayside I,* this Court concluded that numerous provisions of the Code could not withstand constitutional scrutiny, and entered relief accordingly. *Id.* In the wake of that decision, the defendants (hereafter collectively referred to as "the City") passed amendments to the Code in an attempt to align its provisions with the Constitution. This litigation was initiated prior

Norman J. Abood, Jacksonville, Fla., for plaintiffs in No. 78–889–Civ–J–M.

William L. Allen and Grady W. Martin, Asst. Counsels, Jacksonville, Fla., for defendant in No. 78–889–Civ–J–M.

Barry L. Zisser, Jacksonville, Fla., for plaintiffs in No. 78–898–Civ–J–M.

1. By an order entered on December 6, 1978, the cases were consolidated for trial and disposition pursuant to the request of the parties. *See* Fed.R.Civ.P. 42(a).

2. Insofar as the record indicates, these plaintiffs exhibit but do not sell adult films.

to the occurrence of any enforcement measures by the City, and the parties immediately stipulated to a continuation of the status quo pending resolution of this case. Thus, the doctrines of abstention and equitable restraint are inapplicable, see *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 930, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), and the City in fact does not contend otherwise.

Generally, the Code imposes a regulatory scheme on the local adult entertainment industry through a licensing mechanism.[3] Adult entertainment businesses are required to have a license to operate, and license violations (including failure to obtain a license in the first place) can result in both civil and criminal sanctions. The plaintiffs allege numerous constitutional defects in this system. They contend that the provisions governing the granting of an adult entertainment license constitute an impermissible prior restraint due to certain license prerequisites and sanctions; that the disclosure provisions of the license application system infringe upon constitutionally protected areas; that the license fees called for by the Code are impermissibly high; and that the procedures for judicial review of licensing decisions are constitutionally inadequate. In support of these contentions, the plaintiffs variously assert the terms of the first, fourth, fifth, and fourteenth amendments to the United States Constitution.

On February 9, 1979, the Court held a one-day bench trial to develop the factual issues in this case. Following post-trial briefing by the parties, the case is now ripe for adjudication. The plaintiffs' contentions will be treated in the order delineated in the preceding paragraph.

## LICENSE DISQUALIFICATION

The plaintiffs contest the constitutionality of certain Code provisions that mandatorily disqualify license applicants under certain circumstances. Specifically, section 410.204(b) declares that no license shall be granted to "any person who has been convicted of a specified criminal act within five years of the date of application."[4] In turn, section 410.103(m) defines "specified criminal act" to include

> any violation of [the Code]; soliciting for prostitution, pandering, prostitution, keeping a house of ill fame, lewd and lascivious behavior, exposing minors to harmful materials, distributing obscene materials, possession of obscene materials, transporting obscene materials or sale or possession of a controlled substance or narcotic; or any felony under the laws of this State, the United States or any other state.

Even after a license has been issued, commission of a "specific criminal act" may be grounds for revoking a license under the Code; section 410.212(a) provides in pertinent part that

> [t]he Sheriff is given full power to suspend or revoke any license issued under

---

**3.** The Code specifically prohibits the operation of any adult entertainment facility without first obtaining a license. Adult Entertainment Code § 410.203.

    In *Bayside I,* a primary issue was the constitutionality of certain zoning requirements contained in the original Code and aimed at dispersing the geographic placement of adult entertainment businesses. Distinguishing the recent case of *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), this Court held those requirements unconstitutional. See 450 F.Supp. at 699 *et seq.* Following that decision, the City substantially revised the Code's zoning provisions in an attempt to meet the enunciated constitutional standards. In the instant case, these revised zoning provisions are not involved; the parties stipulated that the zoning requirements would

have no present effect on these plaintiffs. *See* Joint Stipulation, filed on February 16, 1979. The Code does contain a "grandfather clause" that would exempt the plaintiffs from the zoning provisions, since the plaintiffs already operated their businesses at the time the zoning restrictions took effect. *See* Adult Entertainment Code § 708.1205.

**4.** Subsection 410.204(b) prescribes similar requirements for partnership and corporate applicants. A partnership is ineligible for a license if any partner, general or limited, has been convicted of a specified criminal act within five years of the date of application. A corporation would be disqualified by such a conviction entered against any of its "officers, directors, or principal stockholders."

this chapter, where the Sheriff determines, upon sufficient cause, that:

(1) the licensee, his or its agents, officers, servants or employees, on the licensed premises, or elsewhere while in the scope of employment, committed a specified criminal act.

In fact, an actual conviction of a "specified criminal act" is not required before the Sheriff may revoke a license. As the language quoted above demonstrates, the Sheriff may revoke a license when *he* determines, "upon sufficient cause", that a "specified criminal act" has been committed. Furthermore section 410.212(a) goes on to state that

[w]hether or not the licensee, his or its agents, officers, servants or employees have been convicted of any such specified criminal act or violation *shall not be considered* in proceedings before the Sheriff for suspension or revocation of license.

(Emphasis added.) Clearly, then, the Code authorizes the Sheriff to revoke an adult entertainment license, predicating that revocation on "sufficient cause" to believe that the licensee has committed a specified criminal act, regardless of whether the licensee has actually sustained a criminal conviction as a result thereof.

The constitutional problems inherent in such a scheme were highlighted by this Court in *Bayside I.* 450 F.Supp. at 708–09. In that case, however, the question was inappropriate for adjudication because the plaintiffs lacked standing to raise the issue, since there was no showing that the Code's "specified criminal act" provisions would in any way affect the *Bayside I* plaintiffs. *Id.* This case is before the Court in an entirely different posture. The plaintiff Keller has testified, and the City does not deny, that within the last five years he has sustained a criminal conviction under the Florida obscenity statute, Fla.Stat. § 847.011 (1978). Under any imaginable construction of Code section 410.204(b), this conviction will bar Keller from obtaining an adult entertainment license from the City. Undeniably, then, he has standing to challenge this portion of the Code.

Like all forms of speech that have not been judicially found otherwise, the motion pictures and books marketed by these plaintiffs are entitled to a presumption of first amendment protection. In the present context, this means that the materials to be marketed by these plaintiffs are presumptively non-obscene, and thus protected in their dissemination by the first amendment. The effect of Code section 410.204(b), then, is this: any person who has committed a "specified criminal act" within five years of the date of his license application cannot lawfully disseminate sexually explicit, though presumably non-obscene, forms of expression. As previously noted, unlicensed dissemination can lead to both civil and criminal sanctions under the Code.

The starting point for the Court's analysis of these Code provisions is the landmark case of *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). *Near* involved the constitutionality of a Minnesota statute that allowed state authorities to obtain a permanent injunction, on a public nuisance theory, barring the future publication of a periodical that was found to be "obscene, lewd and lascivious" or "malicious, scandalous and defamatory." *Id.* at 702, 51 S.Ct. 625. On the basis that past issues of the publication in question, The Saturday Press, had been libelous, the *Near* trial court had permanently enjoined the publishers from "producing, editing, publishing, circulating, having in their possession, selling or giving away any publication whatsoever which is a malicious, scandalous, or defamatory newspaper," and also "from further conducting said nuisance under the name and title of said The Saturday Press or any other name or title." *Id.* at 706, 51 S.Ct. at 627. After the trial court's injunction had been affirmed in the Minnesota courts, the Supreme Court granted certiorari and reversed. Observing that libelous publications are susceptible of both civil and criminal remedies *after* their dissemination, the Court distinguished these remedies from the pre-dissemination injunction in *Near*. As the Court stated, "the statute in question . . . provides for no punish-

ment, except in case of contempt for violation of the court's order, but for suppression and injunction—that is, for restraint upon publication." *Id.* at 715, 51 S.Ct. at 631. On that basis, the Court held the statute unconstitutional.

*Near* clearly stands for the proposition that even in those cases in which a publisher can be shown to have disseminated unprotected materials on past occasions, he cannot be prospectively barred from the exercise of his first amendment rights. As the Court observed in distinguishing the *Near* statute from the New York statute upheld in *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957),

> Minnesota empowered its courts to enjoin the dissemination of future issues of a publication because its past issues had been found offensive. In the language of Mr. Chief Justice Hughes, "This is of the essence of censorship." As such, it was found unconstitutional. This was enough to condemn the statute wholly apart from the fact that the proceeding in *Near* involved not obscenity but matters deemed to be derogatory to a public officer. Unlike *Near,* [the New York statute] is concerned solely with obscenity and, as authoritatively construed, it studiously withholds restraint upon matters not already published and not yet found to be offensive.

*Id.* at 445, 77 S.Ct. at 1330 (citation omitted).

█ Furthermore, as the quoted language from *Kingsley Books* implies, the *Near* principle obtains even where the restraint itself is tailored to apply only to those instances of future conduct that traverse the line between protected and unprotected speech.[5] This point was recently made clear by the Fifth Circuit in *Universal*

*Amusement Co., Inc. v. Vance,* 587 F.2d 159 (5th Cir. 1978) (en banc), wherein the court held unconstitutional a Texas statute authorizing the state to close, by injunction, any motion picture theater that had been proved to have shown obscene material. Even though such a blanket injunction could be limited by its own terms to bar only those films that are obscene (and therefore unprotected) under the relevant statute, such an injunction would still run afoul of the first amendment. As the court said,

> An order banning the exhibition of unnamed "obscene" films would prohibit the showing of films that have not been judicially declared obscene, as well as films that may not have even been produced. Such a blanket ban is not rendered unobjectionable by the interweaving of threats of language from obscenity statutes, for the end result is a sweeping prohibition against the screening of obscene films in general. Incorporation of the statutory definition of obscenity— usually a listing of forbidden sexual acts or acrobatics—merely begs the question, for few of us have the omniscience to determine, in advance of a final judicial ruling, whether a film is legally obscene.

*Id.* at 169. The critical distinction is this: the first amendment will allow injunctive remedies against the dissemination of *particular items* that have undergone judicial review, accompanied by the special procedural safeguards that attend cases in this area,[6] and found to be obscene; the first amendment will *not* allow blanket injunctions directed at materials that have not been judicially found obscene, regardless of the probability—based on the distributor's track record on prior occasions—that the materials will actually be obscene. The Florida Supreme Court, in fact, reached

---

5. As previously noted in the text, the *Near* trial court had enjoined the defendants "from producing, editing, publishing, circulating, having in their possession, selling or giving away any publication whatsoever which is a malicious, scandalous or defamatory newspaper, as defined by law." *Near,* 283 U.S. at 706, 51 S.Ct. at 627.

6. *See, e. g., Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Blount v. Rizzi,* 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

precisely this conclusion in the case that offers the controlling interpretation of Fla. Stat. § 847.011(8) (1978), the Florida "obscene nuisance" statute. *Mitchem v. State ex rel. Schaub,* 250 So.2d 883 (Fla.1971).[7]

There is no distinction of any significance to be drawn between an injunction that imposes a prior restraint on presumptively protected materials, as previously discussed, and a licensing system that accomplishes the same result through the initial denial of a license or the revocation of a license previously issued. In each case, a party is denied the right to disseminate presumably protected materials in the future because he has disseminated unprotected materials in the past. This Court's research indicates that this obvious analogy has been drawn by virtually every court that has considered the matter. *See Natco Theatres, Inc. v. Ratner,* 463 F.Supp. 1124 (S.D.N.Y.1979); *Avon 42nd Street Corporation v. Myerson,* 352 F.Supp. 994 (S.D.N.Y.1972); *Marks v. City of Newport,* 344 F.Supp. 675 (E.D.Ky. 1972); *Mini Cinema 16, Inc. of Fort Dodge v. Habhab,* 326 F.Supp. 1162 (N.D.Iowa 1970); *Oregon Bookmark Corporation v. Schrunk,* 321 F.Supp. 639 (D.Or.1970); *Perrine v. Municipal Court,* 5 Cal.3d 656, 97 Cal.Rptr. 320, 488 P.2d 648 (1971), *cert. denied,* 404 U.S. 1038, 92 S.Ct. 710, 30 L.Ed.2d 729 (1972); *City of Delavan v. Thomas,* 31 Ill.App.3d 630, 334 N.E.2d 190 (3d Dist. App.Ct. 1975); *Alexander v. City of St. Paul,* 303 Minn. 201, 227 N.W.2d 370 (1975); *Hamar Theatres, Inc. v. City of Newark,* 150 N.J.Super. 14, 374 A.2d 502 (Super.Ct.

App.Div.1977); *City of Seattle v. Bittner,* 81 Wash.2d 747, 505 P.2d 126 (1973).

When this analysis is applied to the Code provisions in question, it is beyond cavil that they are unconstitutional. First, with respect to Code section 410.204(b), which denies a license *ab initio* to an applicant convicted of a specified criminal act, the constitutional infirmity is obvious. For the reasons previously discussed, a criminal conviction for any of the offenses so defined simply cannot be used as the basis for denying a license applicant the free exercise of his first amendment rights.[8] Second, with respect to Code section 410.212(a), giving the Sheriff the power to revoke or suspend a license on the basis of the licensee's commission of a specified criminal act, the same principles apply. The Court can conceive of no limiting construction that might legitimate this provision under the first amendment. To avoid constitutional infirmity, the provision would have to be tailored to permit a "partial" revocation, *ad hoc* to the distribution of only those materials that have undergone judicial review and have been found obscene. *Universal Amusement Co., Inc. v. Vance,* 587 F.2d 159 (5th Cir. 1978) (en banc). Read as a whole, this provision is not susceptible of such a construction. It is a *licensing* provision, and under the Code, a person either holds a license or he does not. Accordingly, the Court has no choice but to declare the provision in question unconstitutional.

7. The cases disallowing blanket injunctions predicated on a public nuisance theory are numerous. *See* cases collected in *Universal Amusement Co., Inc. v. Vance,* 587 F.2d 159, 166 n. 13 (5th Cir. 1978) (en banc).

8. The bare contention that the state could deny a convicted criminal his first amendment freedoms as a result of his criminal conviction is of little help in this analysis. Certainly, when the state convicts a person of a crime and orders his incarceration, the convicted person's first amendment rights are incidentally affected, as are many other of the constitutional rights enjoyed by free citizens. *See Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). But in this case the Court is not concerned with first amendment restrictions imposed as an incident to a convicted person's

incarceration. Under the Code, the conviction itself suffices to justify the encroachment on free speech, and as such, the restraint clearly cannot be regarded as "incidental." *See generally United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). And while certain speech-related activities may be infringed upon by the state as a result of a criminal conviction, *see, e. g.,* Fla.Const. Art. VI § 4 ("No person convicted of a felony . . . shall be qualified to vote or hold office until restoration of civil rights . . . ."), that is not the case here. It is one thing to deny a convicted felon the right to vote; it would be quite another thing, in the Court's view, to deny the same felon the right to speak for or against a particular political candidate.

■ In sum, the Court holds that Code sections 410.204(b) and 410.212(a), insofar as they authorize the denial, suspension, or revocation of an adult entertainment license based upon the commission or conviction of a specified criminal act, are incompatible with the first amendment. Accordingly, these provisions are hereby declared unconstitutional, and the defendants are enjoined from enforcing them.

## DISCLOSURE PROVISIONS

The plaintiffs next challenge certain Code provisions governing the application procedures that must be followed in order to obtain a license under the Code. Specifically, they contest the Code's requirements that applications be accompanied by the disclosure of certain information concerning the applicant's background. The Code's disclosure provisions are set forth in the margin.[9]

The plaintiffs' contention is that these provisions infringe upon their rights of privacy and association guaranteed by the first amendment. *See NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The issue is very difficult to evaluate on the present record, how-

---

**9.** 410.205 *License Application; Application Fee.*

(a) *Application.* Any individual, partnership or corporation desiring to engage in the business of operating an adult bookstore, adult massage parlor, adult motion picture theater or adult dancing establishment shall file with the Sheriff a sworn application on forms supplied by the Sheriff. The application shall contain at least the following information:

(1) if the applicant is:

(i) an individual, his name, or

(ii) a partnership, the full name of the partnership and the names of all the partners, whether general or limited, or

(iii) a corporation, the exact corporate name and state of incorporation and the names of all the officers, directors and principal stockholders;

(2) if the business is to be conducted under another name than that of the applicant, the business name and the county of registration under Section 865.09, Florida Statutes;

(3) whether any of the individuals listed pursuant to paragraph (1) has, within the five-year period immediately preceding the date of the application, been convicted of a specified criminal act and, if so, the particular criminal act involved and the place of conviction;

(4) whether any of the individuals listed pursuant to paragraph (1) or whether the applicant has had his license under this chapter previously revoked or has been a partner in a partnership or an officer, director or principal stockholder of a corporation whose license under this chapter has previously been revoked;

(5) the classification of the license for which the application is being filed;

(6) whether the applicant holds any other licenses in the classification for which the application is being filed and, if so, the number and locations of such licensed premises;

(7) the proposed location of the business; and

(8) the names of the employees, if known, or, if presently unknown or there will be no employees, a statement to that effect. If the applicant is a partnership or a corporation, the application will be accompanied by the following documents:

(1) if the applicant is a partnership, the partnership instrument or a certified copy thereof; or

(2) if the applicant is a corporation, the articles of incorporation and all amendments thereto and the certificate of incorporation, or certified copies thereof. The application will contain, or have attached to it a plan drawn to appropriate scale of the proposed licensed premises indicating the areas to be covered by the license, all windows, doors, entrances and exits and the fixed structural features of the proposed licensed premises. The term "fixed structural features" shall include walls, immovable partitions, projection booths, admission booths, concession booths or stands, immovable counters and similar structures that are intended to be permanent. The Code's definition of "principal stockholder" is contained in section 410.103(j), which provides:

*Principal stockholder* means any individual, partnership or corporation that owns or controls, legally or beneficially, ten percent or more of a corporation's capital stock, and includes the officers, directors and principal stockholders of a corporation that is a principal stockholder under this chapter; provided, that if no stockholder of a corporation owns or controls, legally or beneficially, at least ten percent of the capital stock, all stockholders shall be considered principal stockholders, and further provided, that if a corporation is registered with the Securities and Exchange Commission or pursuant to Chapter 517, Florida Statutes, and its stock is for sale to the general public, it shall not be considered to have any principal stockholders.

ever. On the one hand, the plaintiffs have offered little indication, beyond this broad-brush assertion of their right to privacy, of exactly to what extent their privacy and associational rights will be infringed upon by the disclosure called for in the Code. On the other hand, the City has offered no evidence and little argument to indicate what municipal interest will be served by obtaining the information in question. Be that as it may, the Court will attempt to evaluate these provisions in light of the general principles that apply in this area.

To the extent that the Code's disclosure requirements exist merely to advance the City's interests in the safety and welfare of its citizens, and not as a device to suppress free speech or to deter mutual association for that purpose, the Court has little doubt that those requirements are constitutional. *Cf. Chemline, Inc. v. City of Grand Prairie,* 364 F.2d 721 (5th Cir. 1966). The Court would note that it has seen no evidence to indicate that disclosure of the information required under the Code would chill the plaintiffs' exercise of their first amendment

rights. Nor does the Code require the disclosure of information that might be viewed as intimate or confidential, such as specific data on the financial background of license applicants. In general, most of the information sought under the Code is public record material to begin with.[10]

Since there has been no showing that the disclosure requirements would chill the plaintiffs' first amendment rights, the Court's view is that these requirements need only be rationally related to a legitimate municipal purpose in order to withstand constitutional scrutiny. *See Pollard v. Cockrell,* 578 F.2d 1002 (5th Cir. 1978). Clearly, the City has a legitimate purpose in having such information as the names of the persons who are doing business within the City. Similarly, the City has an interest in knowing whether an applicant has previously had his (or its) license revoked. As the foregoing section of this opinion demonstrates, a license revocation under the Code would be constitutionally valid only if it rested on reasons unrelated to speech, such

---

10. By way of comparison, see the extensive financial disclosure provisions involved in *Natco Theatres, Inc. v. Ratner,* 463 F.Supp. 1124 (S.D.N.Y.1979).

The Court's point regarding the absence of any showing in this case of a first amendment "chill", either on free speech or on associational rights, is an important one. Broad assertions that legislation offends a constitutional "right to privacy" should not be subjected to a simplistic analysis; the "right to privacy" itself is too vague a notion for a court to consider *in vacuo. See, generally Whalen v. Roe,* 429 U.S. 589, 599 n. 24, 97 S.Ct. 869, 876 n. 24, 51 L.Ed.2d 64 (1977) (" 'The concept of a constitutional right of privacy still remains largely undefined' "), *quoting* P. Kurland, The Private I, The University of Chicago Magazine 7, 8 (Autumn 1976); *Plante v. Gonzalez,* 575 F.2d 1119, 1127 (5th Cir. 1978), *cert. denied,* — U.S. ——, 99 S.Ct. 1047–48, 59 L.Ed.2d 90 (1979). In each instance, courts must first consider the level of government intrusion into matters that are by their nature private ones, and weigh that intrusion against the governmental purpose behind it. Where the intrusion is slight, a lesser showing of governmental need is required; when the intrusion is great, a more compelling justification must be shown. And as part of this analysis, the courts should consider (and weigh heavily) the possible implication of other constitutional rights—in this case, for example,

the first amendment rights of free speech and free association.

Here, as noted in the text, the degree of intrusion, if indeed there be any intrusion, is slight, since the Code largely seeks information that is a matter of public record in the first place. Furthermore, the plaintiffs have not demonstrated, as a factual matter, that first amendment rights are threatened by the Code's disclosure provisions. Two important considerations must be kept in mind here. First, notwithstanding the fact that these plaintiffs are undeniably involved in activity that is entitled to first amendment protection, they are also running a business. Where first amendment interests are separable from the purely economic aspects of the plaintiffs' position, a lesser variety of judicial scrutiny is mandated. By way of example, the Court imagines that no one *would seriously suggest that a publicly-*held corporation, even one engaged in first amendment-related activities (*e. g.,* newspaper publishing), would be exempt from registration under federal or state securities laws merely because that corporation's business enjoys first amendment protection. Second, it must be remembered that this case involves a *facial* attack on the Code; if the Code is in fact applied in such a way that first amendment activities become imperiled, then that could present an entirely different case.

as the maintenance of substandard sanitary conditions or a failure to pay municipal taxes. And in light of the fact that the City itself would have been the license-revoking authority, it would of course already know of the revocation; thus, requiring that information to appear on the face of a license application would not entail "disclosure" at all, but would at most be a matter of administrative convenience. In fact, with respect to most of the information required under Code section 410.205(a),[11] this same observation could be made.

The only troublesome requirement appears in section 410.205(a)(3), which requires the applicant to divulge any convictions of a "specified criminal act" within the five-year period preceding the date of application. In light of the principles previously discussed, of course, this information would be irrelevant to the initial decision on whether to issue the license. However, there are legitimate reasons, unrelated to the suppression of first amendment rights, for seeking information about prior criminal misconduct. As with any other business, the City has a bona fide interest in the safe and lawful operation of the businesses licensed under the Code. A license applicant's criminal record could substantially further this interest through facilitating the direction of law enforcement efforts to those areas in which they are most needed.

■ On the whole, the Court is of the opinion that the Code's disclosure requirements are not constitutionally offensive. Simply to seek this information is a facially benign municipal action. In the Court's view, potential constitutional questions would arise not from the City's obtaining this information in the first place, but rather from the uses to which the City puts the information. For example, if the City utilizes the information in a deliberate pattern of harassment, constitutional issues would emerge. *See, e. g., P.A.B., Inc. v. Stack,* 440 F.Supp. 937 (S.D.Fla.1977). On the present record, however, there is no reason for the Court to assume that such a malignant intent underlies this ordinance, or that it will be used for unconstitutional purposes. For that reason, the Court holds that the Code's disclosure provisions, and particularly Code section 410.205(a), are constitutional.

## OTHER CONSTITUTIONAL ISSUES

■ The plaintiffs next challenge the Code's revised system of license fees. This issue was thoroughly explored in *Bayside I, see* 450 F.Supp. at 704, wherein this Court held that the City had been unable to justify the license fees imposed by the original Code and accordingly held those fees unconstitutional. *Id.* As the Court observed on that occasion, the basic principle to be applied is that a governmental entity cannot tax the exercise of first amendment rights; when it imposes a tax that might implicate those rights, it has the burden of demonstrating that the tax is designed to finance a system of administration unrelated to the suppression of speech, and that the taxes are as minimal as necessary to meet the costs of that system.

■ In the wake of *Bayside I,* the City substantially reduced the amount of the fees it proposes to charge in connection with its licensing system.[12] The plaintiffs

---

11. See note 9, *supra.*

12. The provisions of former Code section 410.-215(a), struck down in *Bayside I,* are quoted in 450 F.Supp. 696 at 704 n. 10. This section has been revised to read as follows:

    410.215 *License Fees.*

    (a) *Levy of Fees.* There are hereby levied the following annual license fees under this chapter:

    (1) adult bookstore—four hundred dollars.

    (2) adult massage parlors—three hundred fifty dollars.

    (3) adult motion picture theaters, as follows:

      (i) having only adult motion picture booths—thirty-five dollars for each booth; or

      (ii) having only a hall or auditorium—three dollars and fifty cents for each seat or place; or

      (iii) designed to permit viewing by patrons seated in automobiles—three dollars and fifty cents for each speaker or parking place; or

still argue that the fees are too high. The Court has received evidence on this issue, chiefly from city officials who have projected what they expect to spend in administering the Code's provisions. In light of all the evidence, the Court concludes that the fees presently called for under the Code are reasonable, and that they will not impermissibly infringe upon rights protected by the first amendment.

The ends to which the fee monies are to be used are unrelated to communication as such; rather, these monies are earmarked for an administrative system designed to police activity that is at most incidental to the type of business to be regulated. As it now stands, the Code will merely serve perfectly valid municipal interests in public safety and welfare, most notably the presence of safe and sanitary conditions and the prevention of criminal conduct. These interests are wholly unrelated to suppressing free speech and, significantly enough, the plaintiffs have presented no evidence that furthering these interests through the Code's fee system would have the *effect* of suppressing free speech. Put another way, there is no evidence before this Court that these fees will drive the plaintiffs out of business or in any way hamper their ability to communicate through purveying their books and films. In sum, the City has met its burden of proving that these fees are reasonable, and that they are designed to further valid, nonspeech-related municipal interests. Accordingly, they must be held constitutional.

Finally, the plaintiffs urge that the administrative procedure established by the Code for judicial review of license denials or revocations is constitutionally defective in that it places the burden of seeking administrative review of the Sheriff's actions on the applicant himself, and in that it contains inadequate guaranties of promptness and finality. The plaintiffs rely on the line of cases initiating with *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). *See also Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct.

1239, 43 L.Ed.2d 448 (1975); *Blount v. Rizzi,* 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); *Universal Amusement Co., Inc. v. Vance,* 587 F.2d 159 (5th Cir. 1978) (en banc).

■ In the Court's view, this reliance is misplaced. *Freedman* and its progeny deal with the procedures of expedited judicial review, with the burden on the censor, that must accompany governmental restraint upon the dissemination of a particular publication. Under those cases, when the government feels that an item is obscene, it may temporarily withdraw it from free, public circulation; but the obvious risk that a non-obscene, and therefore protected, item will thereby be rendered inaccessible to the public dictates a prompt judicial resolution of the matter, with the burden on the government as suppressor. Under the Code—as it will read after judgment is entered in this case—a licensee's alleged distribution of obscene materials will not furnish grounds for revoking his license, or for denying him a license to begin with. The only permissible grounds for that action would be violations in such areas as sanitation, dangerous physical conditions, or the like. In other words, official action on a license application or an existing license would flow from a failure to observe minimum standards of health and safety, and the violator would be subject to official sanction just like any other business. Under these conditions, the *Freedman* cases are simply inapposite. Accordingly, this Court holds that the Code's administrative procedures are, on their face, constitutional.

### ATTORNEYS' FEES

The attorney for the plaintiff Keller has filed a motion for an award of attorneys' fees against the City pursuant to 42 U.S.C. § 1988 (1976). The Court has considered this motion in light of the record in this case and the ultimate result on the plaintiff Keller's claims, and concludes that, in the exercise of the Court's discretion, a fee award would be inappropriate.

(iv) having a combination of any of the foregoing—the license fee applicable to each under subparagraphs (i), (ii), and (iii).

(4) adult dancing establishment—four hundred dollars.

The attorney's fees statute, 42 U.S.C. § 1988 (1976), authorizes a court to award attorneys' fees to the "prevailing party" in, *inter alia,* civil rights cases. It is clear that the categories of cases included within the terms of section 1988 include those cases alleging violations of first amendment rights. *See Universal Amusement,* 587 F.2d at 172 n. 25. It is also clear, however, that a party must *substantially* prevail to be entitled to a section 1988 award. *Jones v. Diamond,* 594 F.2d 997 at 1026 (5th Cir. 1979), *citing Franklin v. Shields,* 569 F.2d 784 (4th Cir. 1977) (en banc), *cert. denied,* 435 U.S. 1003, 98 S.Ct. 1659, 56 L.Ed.2d 92 (1978). In this case, the plaintiff Keller succeeded on only one claim. In light of the broad relief sought and the extremely limited relief obtained, the Court cannot say that he has substantially prevailed in this litigation. Accordingly, it declines to award attorneys' fees to the plaintiff Keller.

For the foregoing reasons, the Court will on this date enter final judgment in accordance with this opinion.