The CITY OF MINOT, a municipal corporation and political subdivision of the State of North Dakota, and State of North Dakota ex rel. Carroll Erickson, Plaintiffs, Appellees, and Cross-Appellants,

v.

CENTRAL AVENUE NEWS, INC., a foreign corporation, and Donald G. Gittelson, Defendants, Appellants, and Cross-Appellees.

Civ. No. 9918.

Supreme Court of North Dakota.

July 17, 1981.

Nevin Van de Streek, of Eaton, Van de Streek & Ward, Minot, for plaintiffs, appellees, and cross-appellants.

Timothy J. Austin, Mandan, for defendants, appellants, and cross-appellees; Arthur M. Schwartz, Denver, Colorado, of counsel.

VANDE WALLE, Justice.

Central Avenue News, Inc. ["Central"], and Donald G. Gittelson, Central's controlling stockholder, appeal from that portion of a judgment of the district court of Ward County which upheld the constitutionality of two ordinances enacted by the City of Minot ["Minot"]. Minot and the State of North Dakota ex rel. Carroll Erickson, chief of the Minot police department, cross-appeal from that portion of the same judgment which dismissed their attempt to have the operation by Central of an adult entertainment center declared a "public nui-

sance," as defined by Section 42–01–06, N.D.C.C.; to have Central permanently enjoined from distributing obscene materials, pursuant to Section 42–02–01, N.D.C.C.; and to have the premises housing the adult entertainment center closed for one year pursuant to Section 42–02–04, N.D.C.C. With the exception of that portion regarding the disclosure requirement of Ordinance No. 2336, we affirm the judgment of the district court but remand for a determination as to the obscenity or nonobscenity of certain materials.

On October 8, 1979, Central began operating a retail business in the downtown area of Minot for the purpose of selling sexually explicit books and magazines to adults. Central also installed booths in which, for a fee, the occupant may view sexually explicit motion pictures. At all times pertinent to this action the adult entertainment center has been situated in an area zoned by the City as "C–3, Commercial."

At some point prior to the adult entertainment center's opening, Minot officials became aware of Central's plan to open the center and began to consider solutions to problems which they believed would accompany the center's presence in the community. The city council, believing the existence of such an adult entertainment center in Minot would bring about increased law-enforcement problems and have a negative impact on certain neighboring land uses, settled on two solutions: (1) to impose higher license fees on motion-picture booths used for viewing sexually explicit films than are charged for licensing other types of mechanical amusement devices; and (2) to prohibit adult entertainment centers such as the one operated by Central from doing business in certain areas in the city. To implement the first solution the city council amended Minot's Mechanical Amusement Devices license fee ordinance by enacting Ordinance No. 2337.[1] That or-

1. Ordinance No. 2337 states:
 "AN ORDINANCE TO AMEND SECTIONS 6–42 AND 6–54 OF THE CODE OF ORDINANCES PERTAINING TO LICENSE FEES FOR MECHANICAL AMUSEMENT DEVICES
 "BE IT ENACTED BY THE CITY COUNCIL OF THE CITY OF MINOT:
 "1. *Legislative intent and purpose.*
 "The purpose of this ordinance is to recognize and to provide for the fact that the operation of mechanical amusement devices which depict or display specified sexual activities or specified anatomical areas results in increased enforcement problems for the city and additional expense to the city that justifies a higher license fee for these devices than for other mechanical amusement devices. This follows because it is not immediately possible to distinguish between constitutionally protected non-obscene depictions or portrayals of explicit sexual conduct, on one hand, from non-constitutionally protected obscene portrayals of sexual conduct on the other hand. This necessitates greater police vigilance to assure that the lawful business of displaying non-obscene portrayals or depictions of sexual conduct is not used inadvertently or by design as the means of unlawfully displaying or depicting obscenity. In order to recoup some of the costs thus imposed on the city it is appropriate that there be imposed on the persons who profit from such devices some of the costs of insuring that the devices are used only lawfully.
 "2. Section 6–42 of the Code of Ordinances is amended to read as follows:
 "Section 6–42. *Definition.*

 "A 'mechanical amusement device' is a machine which, upon the insertion of a coin or the payment of consideration, operates or may be operated for use as a game, contest, or amusement of any description, or which depicts, displays, or projects directly or indirectly pictures, photographs or other visual images.
 "Section 6–54 of the Code of Ordinances is hereby amended to read as follows:
 "Section 6–54. *License Fees.*
 "The license fee for a mechanical amusement device, other than a device used on a regular basis to depict or display specified anatomical areas or specified sexual activities, shall be $25.00 a year for each device, provided that the owner of 10 or more such devices subject to licensing need pay only $250.00 a year for annual licenses for all of his machines.
 "(b) The license for a mechanical amusement device used on a regular basis to depict or display specified anatomical areas or specified sexual activities shall be $300.00 a machine per year, irrespective of a number of machines owned by any one person.
 "(c) The terms 'specified anatomical areas' and 'specified sexual activities' as used herein are defined in section 2–1 of the zoning ordinance, ordinance number 1149, as amended.
 "(d) The owner of the mechanical amusement device shall furnish a complete list of all devices owned by him subject to licensing with an indication thereon of the location of each machine. The information will be provided as part of the application for a license or licenses.
 "(e) The fees provided for herein shall be payable on July 1st of each year, and prorated on a

dinance requires a $300 annual license fee for each mechanical amusement device used to depict sexually explicit materials. To

daily basis if a license becomes effective at any time other than July 1.

"4. This ordinance shall become effective upon passage and approval. Existing licenses shall remain in effect until they expire by their own terms or upon July 1, 1980, whichever first occurs, except that an increase of license fees with respect to any existing licenses or class of licenses which is accomplished by this ordinance it shall become effective upon the effective date of this ordinance, subject to proration as provided by in subsection 6–54(e).

"5. *Severability.* The provisions in the ordinance are severable and if any of the provisions, sentences, clauses or paragraphs shall be held unconstitutional, contrary to statute, exceeding the authority of the city or otherwise illegal or inoperative by any court of competent jurisdiction, the decision of such court shall not affect or impair any of the remaining provisions, unless the court should conclude that the partial invalidation would frustrate the intent of this ordinance."

2. Ordinance No. 2336 reads:

"AN ORDINANCE TO AMEND THE ZONING ORDINANCE, ORDINANCE NUMBER 1149, AS AMENDED, IN ORDER TO DEFINE ADULT ENTERTAINMENT CENTER AND OTHER RELATED TERMS AND TO PROVIDE THAT ADULT ENTERTAINMENT CENTERS BE RESTRICTED TO LOCATIONS WITHIN THE 'M–2' HEAVY INDUSTRIAL ZONE UNDER CERTAIN CONDITIONS AND LIMITATIONS.

"BE IT ENACTED BY THE CITY COUNCIL OF THE CITY OF MINOT:

"1. Section 2.1 of the Zoning Ordinance, ordinance number 1149, as amended, is hereby amended by the addition thereto of the following definitions:

"(1.1) *Adult Bookstore:* An enclosed building having as a substantial or significant portion of its stock in trade, books, magazines, or other periodicals which are distinguished or characterized by their emphasis on matter depicting or describing specified sexual activities or specified anatomical areas.

"(1.2) *Adult Cimema:* An enclosed building used on a regular basis for presenting pictorial materials or other visual images by way of direct or indirect projection, which materials are distinguished or characterized by an emphasis on the depiction of specified sexual activities or specified anatomical areas, for observation by patrons therein in return for the payment of a consideration, irrespective of the number of patrons who may be able to view the presentation at one time.

"(1.3) *Adult Entertainment Center.* An adult book store or adult cinema, or both.

"(45.1) *Specified Anatomical Areas:*

implement the second solution the Minot city council amended the City's zoning ordinance by enacting Ordinance No. 2336.[2]

"(a) Less than completely and opaquely covered:

"(1) Human genitals, pubic region;

"(2) Buttock;

"(3) Female breast below a point immediately above the top of the areola; and

"(b) Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

"(45.2) *Specified Sexual Activities:*

"(a) Human genitals in a state of sexual stimulations or arousal;

"(b) Acts of human masturbation, sexual intercourse, or sodomy;

"(c) Fondling of human genitals, pubic region, buttock or female breast.

"2. Chapter 15 of the Zoning Ordinance is amended by adding thereto the following section 15–5.

"Section 15–5. *Adult Entertainment Center.* Notwithstanding anything in this zoning ordinance to the contrary, an adult entertainment center shall be permitted only in the M–2 District and in no other district, and then only if the center meets the following conditions:

"(1) The center is located no closer than 1250 feet from any pre-existing church, school, or property zoned R1, R2, R3, or R4.

"(2) The center excludes from its premises those persons less than 18 years of age.

"(3) The center displays no signs visible from the exterior of the center, except for signs identifying the center as an adult book store or adult cinema or both.

"(4) No materials depicted specified sexual activities or specified anatomical areas shall be visible from the exterior of the center.

"(5) The manager and the owners of the center are registered with the Chief of Police and have provided him with such information as he reasonably may require with respect to their identities, including finger prints, and prior criminal records, if any.

"(6) The business premises of the center which are generally open to its patrons are open equally at the same time without charge to members of the city police force who may wish to enter thereon provided the entry is in the course of the discharge of the policeman's duties.

"3. *Effective date.* This ordinance shall become effective as of final passage and approval, but shall be applied retroactively as of October 1, 1979, so that a non-conforming use which comes into existence on or after October 1, 1979, and before the second reading of this ordinance shall not be considered a prior valid non-conforming use.

"4. 'In the event that the retroactive application of this ordinance provided for in Section

That ordinance allows for the operation of adult entertainment centers but restricts the location of such businesses.[3] Both Ordinances No. 2336 and No. 2337 were enacted on November 5, 1979. However, Ordinance No. 2336, which excludes operation of adult entertainment centers from areas of the city zoned as C–3, Commercial, expressly provides that its effect is to be applied retroactively to October 1, 1979. That date is approximately one week before Central began operating its adult entertainment center in a C–3, Commercial, area. Ordinance No. 2336 also provides for compensation to those affected by its retroactive application.

The City initiated an action seeking to restrain Central from engaging in the business of operating an adult entertainment center until it complied with the new ordinances. Central resisted Minot's efforts on the ground that the ordinances were unconstitutional. On October 6, 1980, the district court upheld the constitutionality of the ordinances and permanently enjoined Central from operating an adult entertainment center unless it complied with the ordinances. Subsequently, on December 2, 1980, the district court, on Central's motion, enjoined the City from enforcing the ordinances pending the outcome of this appeal. In its October 6, 1980, judgment, the district court dismissed, for failure to state a claim upon which relief could be granted, the second count of Minot's complaint regarding application of the State's public nuisance laws to the operation of the adult entertainment center. This appeal and cross-appeal are from the district court's October 6, 1980, judgment.

Prior to setting forth and considering the particular issues raised in this appeal it is important to point out that Central is not contending that a governmental authority may not restrict the dissemination of presumptively protected (albeit sexually explicit) books and magazines through the use of a zoning ordinance.[4] Rather, the essence of Central's objection to the ordinances in question is that they represent an unreasonable attempt by the City to exercise its right to regulate such materials.

The issues we now consider are these:

1. Whether or not Ordinance No. 2337, pertaining to license fees for mechanical amusement devices used to exhibit sexually explicit material, is unconstitutional.

2. Whether or not certain sections of Ordinance No. 2336, pertaining to zoning restrictions on adult entertainment centers, are unconstitutional.

3. Whether or not the City's attempt to regulate adult entertainment centers is preempted by the State's Obscenity Control Act.

4. Whether or not Chapters 42–01 and 42–92, N.D.C.C., regarding nuisances, may be used by governmental officials as a means to control obscenity.

---

3 results in the taking of any person's vested rights in such a manner as to require under either the state or federal constitution that he be given just compensation for the taking, the city shall pay compensation to him in the constitutionally required amount in order to permit the retroactive application of this ordinance. The city council by resolution of a majority of its members may authorize the commencement of an eminent domain proceeding in order to condemn rights deemed to have been taken or it may authorize a confession of judgment in the proper amount.'

"5. *Severability.* The provisions in the ordinance are severable and if any of the provisions, sentences, clauses or paragraphs shall be held unconstitutional, contrary to statute, exceeding the authority of the city or otherwise illegal or inoperative by any court of competent jurisdiction, the decision of such court shall not affect or impair any of the remaining provisions, unless the court should conclude that the partial invalidation would frustrate the intent of this ordinance."

3. Central does not argue that its adult entertainment center is not an "adult entertainment center," as defined in Ordinance No. 2336.

4. Indeed, in oral argument before this court, counsel for Central stated: "Under the zoning regulations, I think, Your Honor, that we have a valid zoning law, with this law, except for its retroactive application and except for its disclosure of prior criminal records, I think it goes too far." In addition, Central acknowledges the right of governmental authorities to zone adult entertainment centers, and cites *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), for this proposition.

Although Central does not challenge a governmental authority's power to impose zoning restrictions and licensing requirements on adult entertainment centers such as the one operated by Central, we believe it would be beneficial to place that power into perspective before proceeding with consideration of the issues raised herein.

 It has long been settled that municipalities may utilize land-use regulation in an effort to maintain order with respect to the quality of life as cities grow. In *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303, 310 (1926), the Supreme Court pointed out that zoning regulations "must find their justification in some aspect of the police power, asserted for the public welfare." Further, the Court in *Euclid* set forth the standard for measuring the soundness of a zoning ordinance when it stated:

"If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control." 272 U.S. at 388, 47 S.Ct. at 118, 71 L.Ed. at 311.

In North Dakota the validity of a city's attempt to exercise its police power is measured by the standard established in *Soderfelt v. City of Drayton*, 79 N.D. 742, 752, 59 N.W.2d 502, 507 (1953):

"Statutory enactments and municipal ordinances having for their purpose the protection of the public health, safety, morals and public welfare are founded upon the police power inherent in the state. In passing upon the constitutionality of such statutes or ordinances the courts will not declare them unconstitutional and thus substitute their judgment for that of the legislative body charged with the primary duty and responsibility of determining the question where the question is fairly debatable, that is, unless the statute or ordinances are clearly arbitrary and unreasonable having no substantial relation to the public health, safety, morals or public welfare."

 In the instant case the city council of Minot is the legislative body charged with the primary duty and responsibility of determining the question of what protects the public health, safety, morals, and general welfare of the city. Section 40–47–01, N.D.C.C.[5] In fulfilling this duty, the body enjoys a general presumption of validity regarding the laws it enacts. *Horst v. Guy*, 219 N.W.2d 153 (N.D. 1974).

 In *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), the Supreme Court considered the constitutionality of a Detroit zoning ordinance which, except for the retroactive effect, was substantially similar to the zoning ordinance here involved. A plurality of the Court determined that while the First Amendment would not tolerate the total suppression of sexually explicit materials that have some arguably artistic value, it is unquestionable that society's interest in protecting such material is not nearly so keen as the interest in protecting political debate. The Court went on to observe:

"But few of us would march our sons and daughters off to war to preserve the citizen's right to see 'Specified Sexual Activities' exhibited in the theaters of our desire." 427 U.S. at 70, 96 S.Ct. at 2452, 49 L.Ed.2d at 326.[6]

5. Section 40–47–01, N.D.C.C., states:

 "*Cities may zone—Application of regulations.* For the purpose of promoting health, safety, morals, or the general welfare of the community, the governing body of any city may, subject to the provisions of chapter 54–21.3, regulate and restrict the height, number of stories, and the size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, structures, and land for trade, industry, residence, or other purposes. Such regulations may provide that a board of adjustment may determine and vary the application of the regulations in harmony with their general purpose and intent and in accordance with general or specific rules therein contained."

6. In a concurring opinion, Justice Powell declined to assign a lesser degree of interest to the First Amendment protection of sexually explicit material and instead concluded that the Detroit zoning ordinance should stand because it imposed only an incidental restriction on

It therefore is clear that a city may enact zoning ordinances which classify and restrict commercial enterprises such as Central's adult entertainment center in ways different from other commercial enterprises notwithstanding the fact that the stock in trade of such an adult entertainment center has peculiar constitutional protection.

 Minot also has the power to enact ordinances which impose licensing requirements on the operation of amusement devices offered to the public by Central in its adult entertainment center. Section 40–05–01(26), N.D.C.C. However, it cannot be strongly urged that a licensing scheme directed at the dissemination of presumptively protected material is not a prior restraint on First Amendment rights. Further, while systems of prior restraint are not unconstitutional per se, they do stand before a court bearing a heavy presumption against their constitutionality. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). A system of prior restraint "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Freedman v. Maryland*, 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649, 654 (1965). With the City's power to enact zoning and licensing ordinances in mind we now proceed to a consideration of the issues raised by Central.

## LICENSING

Central raises two primary issues regarding Ordinance No. 2337, the licensing ordinance. Central argues that the fees imposed for licenses to operate the motion-picture booths are confiscatory in nature. Central's second complaint regarding Ordinance No. 2337 is that the official charged with executing the provisions of that ordinance is vested with too much discretion in that capacity and that this problem is aggravated by the ordinance's lack of procedural guarantees of prompt judicial review of the official's actions.

First Amendment rights in light of the test enunciated in *United States v. O'Brien*, 391 U.S.

 The First Amendment to the Federal Constitution provides:

"Congress shall make no law ... abridging the freedom of speech, or of the press."

The fundamental right of free speech, which is protected from Federal action by the First Amendment, is afforded the same protection from State action through application of the Due Process Clause of the Fourteenth Amendment. *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936). A State may not impose a charge for the enjoyment of a right granted by the Federal Constitution. *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). However, a governmental authority is not strictly forbidden from imposing some financial burden incidental to the exercise of First Amendment rights. *Grosjean, supra*. Licensing fees levied on practices or businesses the nature of which revolves around the exercise of First Amendment rights will withstand a constitutional attack only if they are nominal and imposed only as a regulatory measure to defray the expenses of policing the activities in question. *Murdock, supra*.

While Central concedes that the City may impose a licensing fee to defray the cost of policing the operation of amusement devices, it nevertheless maintains that the fee may not exceed the expenses for what it calls the "routine processing." Presumably, Central is referring to the bureaucratic mechanics involved in the actual issuance of a license and concludes that all expenses cease once a license has been issued. We are not convinced that the Supreme Court had in mind such a narrow construction of the concept of "policing" in *Murdock, supra*. Indeed, the closing language in *Murdock*, where the Court once again refers to the range of expenses which may be defrayed by the licensing fees, includes as permissible the cost of "protecting those on the streets

367, 88 S.Ct. 1673, 1676, 20 L.Ed.2d 672 (1968).

and at home against the abuses of solicitors."[7] 319 U.S. at 116, 63 S.Ct. at 876, 87 L.Ed. at 1300, citing *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

Central also argues that Minot has failed in its burden of proof that the $300-per-device fee is reasonable. The essence of Central's argument is that because Minot has not yet administered the licensing ordinance over an extended period of time it is impossible for the City to do anything more than speculate that $300 is a reasonable fee. Thus Central concludes that Minot's burden of proving the reasonableness of the fee has not and cannot be met. Central is correct in its assertion that where a city ordinance imposes a fee which threatens to interfere with the right guaranteed by the First Amendment, the burden of proving the reasonableness of that fee falls on the City. *NAACP v. Chester*, 253 F.Supp. 707 (E.D.Pa. 1966). However, Central does not point to, nor has our own research unearthed, authority to the effect that a city must, before implementing a licensing scheme with a fee, demonstrate what the administrative costs would have been in the past had the licensing scheme been in effect. Moreover, we believe that Central's reliance upon *Bayside Enterprises, Inc. v. Carson*, 450 F.Supp. 696 (M.D.Fla. 1978), to support its contention is misplaced. In *Bayside*, the licensing fee in question was struck down not because it was speculative, but because the City of Jacksonville's projected costs of enforcing a newly enacted licensing ordinance for adult bookstores were unreasonable. Thus, regarding the licensing fee at issue in the instant case, we are left to determine only its reasonableness.

Testimony at trial by the Minot city manager indicates that the cost of issuing a license required by Ordinance No. 2337 would generally be the same as the cost for issuing any other license required by law. However, as has already been pointed out, licensing-fee schedules such as the one at issue here may be designed to defray not only the cost of issuing the license but also the reasonable cost of policing the activity being licensed. It is beyond question that the police departments of North Dakota cities stand on the front line regarding enforcement of Chapter 12.1–27.-1, N.D.C.C., the State Obscenity Control Act. It is further indisputable that with the presence in the city of amusement devices used for exhibiting sexually explicit films, the level of vigilance required for the enforcement of the Obscenity Control Act is substantially increased. Further, it does not defy reason to conclude that any expenses associated with increased enforcement should be borne by those who profit from the devices rather than being spread among the taxpayers or other owners of more innocuous amusement devices. These propositions constitute what Minot offers as its basis for the $300-per-device license fee required by Ordinance No. 2337. Minot's chief of police testified at trial as to the anticipated level of law-enforcement activities that will be required, including both the anticipated cost of the routine policing of Central's amusement devices as well as the anticipated cost of proceeding on a suspected violation of the Obscenity Control Act. Using one amusement device such as Central's movie booths as an example, the chief of police testified that even one visit per month by an officer could occupy an hour's time. The chief testified that a regular officer's pay rate is approximately eight to ten dollars per hour. At a pay rate of nine dollars per hour this would amount to approximately $108 per year per amusement device to be expended by the City just to determine whether or not to proceed further on a suspected violation of the Obscenity Control Act. The chief testified that should the investigating officer suspect a

---

7. In *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), the Supreme Court found that a city ordinance requiring religious colporteurs to pay a license tax prior to their activities did not provide for a nominal fee imposed as a regulatory measure, and calculated to defray the expenses of policing the activities involved, but rather operated as a tax on the exercise of a fundamental right.

violation, the time spent in preparation for court action would be approximately 12 hours per violation. This, of course, would mean another $108 dollars. The chief further testified that his projected figures did not include costs for clerical and other support services related to such enforcement.

Central places strong emphasis on the fact that Minot was unable to demonstrate that since the bookstore has opened, additional personnel, equipment, and supplies have been required by the police department which are attributable to the presence of the adult entertainment center. However, the chief of police testified that during this time officers have been called away from other duties or have worked overtime on the increased enforcement duties brought about by the adult entertainment center's presence.

Our review of the record does not lead us to the conclusion that the projected costs associated with increased enforcement activities brought on by the particular amusement devices here involved are facially unreasonable. We believe $300 per year does not exceed what Minot could reasonably expect to expend while administering and policing the licensed activity of operating these amusement devices.

Central's next argument regarding Ordinance No. 2337 is twofold. Central argues that the licensing ordinance allows for too much discretion on the part of the official charged with the authority to issue a license and that the ordinance fails to provide for a speedy review of an alleged abuse of that discretion. Regarding the first element of this argument we believe that Central has presumed something which simply does not exist.

We do not believe that the cases relied upon by Central, as well as other cases dealing with the issue of discretion in a licensing scheme, support Central's contention that Ordinance No. 2337 provides for unfettered discretion on the part of the person responsible for issuing licenses. Those cases can be categorized in one of two ways: (1) the ordinance or regulation at issue expressly provided that the official

or officials in whose power the issuance of the license rested could issue a license when they personally believed the activity to be licensed was acceptable; or (2) the ordinance or regulation at issue simply provided, without more, that before the activity desired could be carried out a license must be obtained from a certain official or body of officials. See, e.g., *Southeastern Promotions, Ltd. v. Conrad, supra; Shuttlesworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Freedman v. Maryland, supra; Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); *Bayside Enterprises, Inc. v. Carson, supra; Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948). In all of these cases the issuance of the license was not a matter of routine; instead, it encompassed the consideration of facts, the exercise of judgment, and the formation of an opinion by the official or officials responsible for issuing the license in question. In the instant case, our examination of Ordinance No. 2337 leads us to conclude that not only does it not place too much discretion in the hands of the issuing authority; it places no discretion whatever in those hands.

Ordinance No. 2337 provides for three conditions to be met before a license will be issued: (1) $300 per amusement device must be paid to the City; (2) identification and location of each amusement device must be provided to the licensing authority; and (3) the license fee is payable on July 1 of each year. We believe that these three conditions constitute narrow, objective, and definite standards and preclude the exercise of discretion on the part of the licensing official. *Shuttlesworth v. Birmingham, supra.* We will not presume that the city official in Minot who has the responsibility of issuing the licenses will not obey the law, will not do what his duty requires him to do, and will not perform his duty correctly and in good faith. *Schell v. Collis*, 83 N.W.2d 422 (N.D. 1957); *Harding v. City of Dickinson*, 76 N.D. 71, 33 N.W.2d 626 (1948). If a license applicant believes that he has been denied a license because the licensing official has introduced an impermissible ele-

ment of discretion into the licensing process, the proper remedy would lie in an application for a writ of mandamus. Ordinance No. 2337 need not specifically point that out in order to be valid.

## ZONING

Central raises several issues in claiming that elements of Ordinance No. 2336 are unconstitutional. First, Central argues that the disclosure requirements of that ordinance constitute an impermissible infringement on freedom of association and belief. Second, Central asserts that the distance requirements of the ordinance unconstitutionally suppress or restrict access to lawful speech. Finally, Central urges that even if the provisions in the ordinance survive a constitutional challenge, those provisions may not be applied retroactively.

■■■ Before discussing the issue raised by Central regarding the ordinance's disclosure requirement we consider Central's assertion that the information sought by Minot through the disclosure provision could not conceivably be related to the concept of zoning. While we admit to having some difficulty understanding why this particular provision appears in the zoning ordinance rather than as a part of the licensing ordinance we are not disposed to strike down the zoning ordinance on that basis. As a general rule, courts apply the same rules of construction to municipal ordinances as they do to State statutes. 62 C.J.S. *Municipal Corporations* § 442. Thus all ordinances and statutes relating to the same subject matter are to be construed together so as to harmonize them, if possible, and give full force and effect to true legislative intent. *Dickinson Public School District No. 1 v. Scott*, 252 N.W.2d 216 (N.D. 1977). It is clear in the instant case that Ordinance No. 2336 and Ordinance No. 2337 are companion ordinances intended to alleviate the problems Minot officials believe would accompany the presence of adult entertainment centers in that city. It will be under this light that we consider the constitutionality of the disclosure requirement in Ordinance No. 2336.

■■■ Government requirements of disclosure of information by its citizens cannot be dealt with lightly. In this regard the Supreme Court has held that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659, 713 (1976). In order that a governmental requirement of disclosure may withstand a constitutional challenge a substantial relationship must exist between the information sought to be disclosed and a significant governmental interest to be served by the disclosure. *Buckley, supra.* It is important to point out that the standard enunciated in *Buckley* came about as a result of the Supreme Court's concern over the effect compelled disclosure would have on individuals and groups involved in promoting unpopular political theories. However, we find appropriate the language in *NATCO Theatres, Inc. v. Ratner*, 463 F.Supp. 1124, 1132 (S.D.N.Y. 1979):

"Such a strict standard need not necessarily apply when the type of association involved is one in which individuals have joined together for the purpose of engaging in profit making activity (as opposed to advocacy of ideas) and when the speech in question is that which was found by the plurality in *Young v. American Mini Theatres*, 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976), to be a 'type of expression [which] is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate.' "

■■■ It can hardly be argued that the operation of an "adult entertainment center," as defined by Ordinance No. 2336, does not potentially pose more law-enforcement problems than the operation of a more traditional movie theater or bookstore. The very nature of the material found in an adult entertainment center may lie perilously close to, or indeed fall into, the category of material which is prohibited from distribution under the Obscenity Control Act. When the provisions of that Act are violated it is the duty of law-enforcement

agencies to seek out and identify those responsible. We cannot say that it is unreasonable for the City of Minot, in anticipation of possible violations, to attempt to identify those ultimately responsible rather than just the violator's clerks or agents. Thus some degree of disclosure is substantially related to the purpose of limiting purveyors of obscenity from operating within Minot. While we believe the purpose advanced by Minot to support its disclosure requirement is significant and further believe that disclosure is substantially related to the purpose, we are concerned that elements of the disclosure requirement at issue here exceed constitutionally permissible boundaries. It has long been a general proposition of First Amendment law that where there is a governmental infringement on the rights guaranteed by that Amendment "[t]he breadth of [that] legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960).

■ Under Ordinance No. 2336 owners and managers of adult entertainment centers are required to furnish to the chief of police "... such information as he reasonably may require with respect to their identities, ..." We have already acknowledged that it is not unreasonable for the City of Minot to want to know who is responsible for the operation of adult entertainment centers. However, we believe that the term "identities" warrants specific standards such as name and address. A person's "identity" may be established with reference to innumerable bits of information and because the establishment of identity under Ordinance No. 2336 is contingent upon the "reasonable" satisfaction of one individual with no measurable criteria to guide him, that element of the disclosure requirement effectively places the question

of whether or not a person may operate an adult entertainment center in the discretion of one person. This is a condition which cannot conceivably be labeled as the "less drastic" means for promoting an otherwise significant governmental interest. In light of this, that portion of the disclosure requirement relating to what the chief of police may reasonably require—other than fingerprints—with respect to identity must fail.

■ In addition to the general requirement that owners and managers of adult entertainment centers provide the chief of police identification information which he might reasonably require, Ordinance No. 2336 specifically requires that the owners and managers provide the chief of police with their fingerprints and "prior criminal records, if any." Arguably, law-enforcement agencies would be aided in their surveillance and enforcement activities regarding adult entertainment centers if they knew, for instance, which owners or managers of such businesses had been convicted for crimes related to obscenity. However, there clearly are some types of criminal convictions which in no way can be associated with the operation of a business in general or to adult entertainment centers in particular. In this respect we believe that the requirement of disclosing prior criminal records goes too far. A more narrowly drawn criminal-record-disclosure requirement focusing on particular crimes which are reasonably related to the governmental interest involved herein might survive constitutional scrutiny.

■ Central's next contention regarding the zoning ordinance is that the distance limitations set forth in Ordinance No. 2336 have the effect of suppressing or greatly restricting access to lawful speech. We do not agree.[8] As was indicated by the Su-

8. Central does not raise, and we therefore do not consider, the question of—notwithstanding the ruling in *Young v. American Mini Theatres*, fn. 4, *supra*, that States may classify sexually explicit material differently from other material protected under the *First Amendment*—wheth-

er or not the classification drawn by Ordinance No. 2336 is justified by a paramount interest advanced by Minot. However, we note that the Court in *Young* approvingly pointed out that the record had disclosed a factual basis for the Detroit Common Council's conclusion that

preme Court in *Young v. American Mini Theatres, supra,* 427 U.S. at 71, 96 S.Ct. at 2452, 49 L.Ed.2d at 327, footnote 35, the pivotal question here does not focus on whether or not a certain distance is permissible, but rather on the question of whether or not the ordinance has the effect of suppressing, or greatly restricting, access to lawful speech.

Ordinance No. 2336 provides that an adult entertainment center may locate in Minot only on property zoned as M–2 and then only if the center is located no closer than 1,250 feet from any pre-existing church, school, or property zoned R1, R2, R3, or R4. The district court's findings of fact show that the parties to this action stipulated to the admission into evidence of a map depicting where, within the area subject to Minot's zoning jurisdiction, Central could relocate the operation of its adult entertainment center. The court also found as fact that there is available, within such area, for purposes of operating an adult entertainment center, "land which is equivalent in area to a combination of many city blocks." We find this particularly significant in light of the fact that a central concern of the courts in other cases considering this issue was the effect of the distance limitation or, more precisely, the zoning space as it relates to the ability of people in the future to gain access, as buyers or sellers, to the adult entertainment market. See *Young v. American Mini Theatres, supra; Genusa v. City of Peoria,* 475 F.Supp. 1199 (C.D.Ill.1979); *Bayside Enterprises, Inc. v. Carson, supra.* The fact that there exists a substantial amount of area within Minot's zoning jurisdiction which is available for the purpose of operating an adult entertainment center leads us to conclude that Ordinance No. 2336 neither suppresses nor greatly restricts access to the adult entertainment market.

Thus in *Schad v. Borough of Mount Ephraim,* —— U.S. ——, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), the United States Su-

preme Court reversed the conviction of the operators of an adult bookstore which contained coin-operated devices that displayed adult films as well as a coin-operated mechanism permitting a customer to watch a nude live dancer. The operators were convicted of violating a zoning ordinance that prohibited all live entertainment in the municipality. The United States Supreme Court noted that as the ordinance had been construed by the New Jersey courts it prohibited all live entertainment, and observed:

"By excluding live entertainment throughout the Borough, the Mount Ephraim ordinance prohibits a wide range of expression that has long been held to be within the protections of the First and Fourteenth Amendment. Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee. [Citations omitted.]" —— U.S. at ——, 101 S.Ct. at 2181, 68 L.Ed.2d at 678.

The Court further noted that the case was not controlled by *Young v. American Mini Theatres, Inc., supra,* because in that case the restriction did not affect the number of adult movie theaters that could operate in the city; rather, it merely dispersed them. The Court further observed that in *Young v. American Mini Theatres* it did not imply that a municipality could ban all adult theaters—much less all live entertainment or all nude dancing—from its commercial districts citywide:

"To be reasonable, time, place and manner restrictions not only must serve significant state interests but also must leave open adequate alternative channels of communication. [Citations omitted.] Here, the Borough totally excludes all live entertainment, including nonobscene nude dancing that is otherwise protected by the First Amendment. As we have

the zoning ordinance at issue in that case would effectively promote the City's interest in

preserving the character of its neighborhoods.

observed, *Young v. American Mini Theatres, Inc., supra,* did not purport to approve the total exclusion from the city of theaters showing adult, but not obscene, materials. It was carefully noted in that case that the number of regulated establishments was not limited and that '[t]he situation would be quite different if the ordinance had the effect of supressing, or greatly restricting access to, lawful speech.' " —— U.S. at ——, 101 S.Ct. at 2186, 68 L.Ed.2d at 684.

Here, the City of Minot has not attempted to restrict all forms of live entertainment or all adult bookstores from the areas zoned by the City of Minot. As we have already noted, there are many areas available in the zoned areas in which adult bookstores may operate. For these reasons we conclude that this matter is governed by *Young v. American Mini Theatres, Inc.,* rather than by the recent decision of *Schad v. Borough of Mount Ephraim.*

Central also asserts that it may not, through Ordinance No. 2336, be deprived of previously vested property rights. Central places substantial reliance for this proposition on footnote 35 of *Young v. American Mini Theatres, supra,* 427 U.S. at 71, 96 S.Ct. at 2452, 49 L.Ed.2d at 327, wherein the plurality stated:

> "The situation would be quite different if the ordinance had the effect of suppressing or greatly restricting access to lawful speech. Here, however, the district court specifically found that 'the ordinances do not affect the operations of existing establishments but only the location of new ones.' "

It is on the second sentence of this quoted portion that Central, we believe, misplaces its reliance. That sentence, if for no other reason than it is found in a footnote rather than in the opinion proper, did not represent an issue upon which the approval bestowed by the Court on the Detroit zoning ordinance in that case turned. We believe the emphasis on the last sentence should fall on the word "operations." The physical location of an adult entertainment center was of importance to the Court only to the extent of its effect on the operation of that center as it relates to access to the adult entertainment market by buyers and sellers. The second sentence of the quoted portion simply cannot be construed to stand for the proposition that a zoning ordinance such as the one in the instant case never may be applied retroactively.

Ordinance No. 2336 contains a provision that, should the retroactive application of the ordinance result in the type of taking of vested property rights in a manner requiring that the divested owner be compensated, the city council may commence eminent-domain proceedings or authorize a confession of judgment to compensate the divested owner. This type of provision in a zoning ordinance is not altogether unusual but has been subject to attack. Assaults on such a zoning-with-compensation ordinance may be divided into three general categories. See 41 A.L.R.3d 636. First, some of those opposing such an ordinance have claimed that the municipality did not have authority to enact the ordinance. Second, in some cases attackers have asserted that the ordinance involved the taking of property for a private, rather than public, use. And, finally, in some instances claims have been made that the ordinance was unreasonable. Central has not specifically asserted any of these claims regarding the zoning-with-compensation element of Ordinance No. 2336, but prefers to allege simply that it may not be deprived of its vested property rights by the retroactive application of that ordinance.[9]

9. The guiding principles regarding the taking of private property by the Government for public purposes are found in the Fifth Amendment, U. S. Constitution, and in Article I, Section 16, North Dakota Constitution. Among the Government prohibitions itemized in the Fifth Amendment is the following: " ... nor shall private property be taken for public use, without just compensation." Section 16, North Dakota Constitution, provides, in part: "Private property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for the owner." Central does not assert that the zoning-with-compensation scheme of Ordinance No. 2336 would violate these principles.

■ The power of eminent domain is inherent in the State, but a municipality does not hold such power unless it has been expressly granted to it by the Legislature or it exists by necessary implication. *City of Fargo, Cass County v. Harwood Township*, 256 N.W.2d 694, 699 (N.D.1977). In this State municipalities such as Minot have been granted the power of eminent domain through Section 40–05.1–06(1), N.D.C.C.

■ As noted earlier, Minot has the authority to enact land-use regulations without a corresponding obligation to compensate a property owner for the restrictions placed on the use of his property. *Euclid v. Ambler Co., supra*; Section 40–05.1–06(11), N.D.C.C. We see the zoning-with-compensation element of Ordinance No. 2336 as a coupling of Minot's zoning power with its power of eminent domain derived from Section 40–05.1–06(1), N.D.C.C. We know of no prohibition against the enactment of an ordinance which reflects the combination of these two powers and is designed to be invoked in order to alleviate a particularly onerous burden which may befall a property owner who is forced to relocate as a result of the retroactive application of a legitimate exercise of a municipality's land-use-regulation authority.

■ Central's only specific allegation with respect to what it regards as the weaknesses of the zoning-with-compensation provision in Ordinance No. 2336 is that such a scheme "grants the city council unlimited discretion to commence an eminent-domain proceeding and enforce its retroactive application." Central contends that this "unbridled" discretion in some way violates the Constitution. In this regard we point out that in this State it is well settled that the power of eminent domain includes discretion to determine the necessity of exercising the power and the location of the site to be taken. *Northern States Power Co. v. Effertz*, 94 N.W.2d 288 (N.D.1958).

**10.** Section 5–02–09, N.D.C.C., states:

"*Local regulations.*—The local governing body by ordinance or resolution may regulate or restrict the operation of licensees including among other things determining the num-

## PRE–EMPTION

Central next asserts that even if the two ordinances at issue here are found by this court to be constitutionally sound, Minot is precluded from enacting or enforcing such ordinances because of Section 12.1–27.1–12, N.D.C.C. At the time Minot enacted the ordinances, that Section, which is entitled "State pre-emption of local laws regulating obscenity," provided:

"This chapter shall be applicable and uniform throughout the state, and no political subdivision shall enact new, or enforce existing, ordinances or resolutions regulating or prohibiting the dissemination of obscene materials, or controlling obscene performances, except ordinances authorized by section 5–02–09."[10]

Central relies on *City of Grafton v. Four G's, Inc.*, 252 N.W.2d 879 (N.D.1977), to support its proposition that the pre-emption statute at Section 12.1–27.1–12 prohibits Minot from enacting the zoning and licensing ordinances.

In *Four G's*, we considered a bar owner's conviction under a Grafton ordinance which prohibited liquor licenseholders from permitting certain acts and conduct of a sexual nature, whether or not they were obscene, to be displayed in that city's licensed liquor establishments. We determined that the enactment of such an ordinance was prohibited in light of the pre-emption characteristics within the State's Obscenity Control Act. The Grafton ordinance had been enacted by the City in reliance on the authority vested in it through Section 5–02–09, N.D.C.C. We subsequently decided that— because of the rule in Section 1–02–07, N.D.C.C., that a specific statute controls a general statute—the general pre-emption statute, Section 12.1–27.1–12, would not prevail over the specific grant of authority in Section 5–02–09 if only these two statutes were

ber of licenses to be granted, establishing health and safety standards for licensed premises, setting of hours and prohibition of dancing or various forms of entertainment on the premises."

involved.[11] However, we concluded that our consideration could not be limited to these two statutes because of the existence of Section 12.1–27.1–01(3).[12] At that point we were called upon to determine whether Section 12.1–27.1–01(3) repealed by implication the authority Section 5–02–09 would otherwise give local governing bodies to control the type of conduct in liquor establishments which the City of Grafton sought to control through its ordinance. Our examination of the legislative history of Section 12.1–27.1–01(3) revealed that the Legislature relied almost exclusively on *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), as its basis for enacting Section 12.1–27.1–01(3). In *California v. LaRue*, the Supreme Court held that the Twenty-first Amendment provides States with an extra degree of authority to control conduct of a sexual nature, whether or not it is obscene, in their licensed liquor establishments, even though, because of the First Amendment, that same behavior might be immune from such special classification if it were to take place outside those establishments. Thus, in *Four G's*, we concluded that the legislative history of Section 12.1–27.1–01(3) clearly reflected the Legislature's intention to enact a law which would specifically prohibit local governing bodies from not only regulating or prohibiting obscenity in their licensed liquor establishments, but, because of the Legislature's reliance on *California v. LaRue, supra*, also from "*attempting* to control obscenity" under Section 5–02–09. [Emphasis added.] *Four G's, supra*,

252 N.W.2d at 883. Therefore, as a result of *Four G's*, a municipality was precluded from enacting ordinances which attempted to control entertainment of a sexual nature in liquor establishments even where such entertainment may not be obscene.[13]

Our determination of the pre-emption issue raised by Central in the instant case differs from the issue facing us in *Four G's*, in that, unlike our consideration in *Four G's* of Section 12.1–27.1–01(3) regarding licensed liquor establishments, we are not required here to consider a specific section in the Obscenity Control Act regarding the prohibition on municipalities' attempts to control adult entertainment centers. Indeed, the situation confronting us in this case is much more akin to the obscenity pre-emption issue in *Midtown Palace, Inc. v. City of Omaha*, 193 Neb. 785, 229 N.W.2d 56 (1975), which, in *Four G's*, we determined, because of the absence in *Midtown Palace* of a Section 12.1–27.1–01(3)-type statute, was not applicable to our consideration.

In *Midtown Palace* a liquor licenseholder sought a declaratory judgment that a city ordinance, an ordinance substantially similar to the ordinance at issue in *Four G's, supra*, was void because of the State's obscenity pre-emption statute.[14] The court concluded that nudity and obscenity are not synonymous, in that nudity does not become an obscene performance unless that performance constitutes obscenity under the standards of *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The Nebraska court went on to point out

11. At the time we decided *Four G's*, Section 12.1–27.1–12 did not include the language "except ordinances authorized by Section 5–02–09."

12. That subsection states:
 "3. A person is guilty of a class A misdemeanor if he, as owner or manager of an establishment licensed under section 5–02–01, permits an obscene performance in his establishment. A person is guilty of a class A misdemeanor if he participates, whether or not for compensation, in an obscene performance in an establishment licensed under section 5–02–01."

13. At the legislative session following our decision in *Four G's*, the pre-emption statute at Section 12.1–27.1–12 was amended to allow

municipalities to utilize Section 5–02–09 to control sexually oriented conduct in licensed liquor establishments. See 1979 N.D.Sess. Laws ch. 184.

14. We emphasize that we do not see as significant the fact that *Midtown Palace* and *Four G's* involved licensed liquor establishments and not, as here, adult entertainment centers. The focus in both of those cases, as it is here, was on the issue of whether or not the attempts by the municipalities to control certain sexually related activities was done in violation of the State's general obscenity control pre-emption statute.

that the ordinance in question did not declare nudity to be obscene nor delineate it as a crime. Further, the court observed that the ordinance merely attempted to control nudity as a technique in selling liquor and that this was a legitimate objective under *California v. LaRue, supra.*

▮▮▮▮ We believe that the Minot ordinances at issue here were not enacted in violation of Section 12.1–27.1–12. This belief is founded upon an analysis similar to the one employed by the court in *Midtown Palace, supra.* Sexually explicit material is not without constitutional protection unless it is of the nature described in Section 12.1–27.1–01(4), N.D.C.C. (i. e., obscene material). Minot's zoning and licensing ordinances do not attempt to define sexually explicit material as obscene nor do they delineate its sale as a crime. The ordinances attempt to control the manner in which sexually explicit material is disseminated and this, as has been earlier pointed out, is a legitimate objective. *Young v. American Mini Theatres, supra.* In light of this, we conclude that Ordinance No. 2336

15. We point out that as a result of recent legislative action consideration of this issue as it relates to Minot's zoning authority would have been unnecessary had Minot enacted Ordinance No. 2336 after April 1, 1981. On that date the Legislature enacted and made effective an emergency measure [S.B. 2237] which amended Section 12.1–27.1–12. The amendment specifically excepted the zoning authority of municipalities from the impact of the general pre-emption of obscenity control in Section 12.-1–27.1–12. We do not view the action of the 47th Legislative Assembly in enacting S.B. 2237 as an indication the cities had no zoning authority in these instances; rather, we view it as a clarification of that authority. See, e. g., *St. Vincent's Nursing Home v. Department of Labor,* 169 N.W.2d 456 (N.D.1969).

16. The portion of Section 42–01–01 relied upon by Minot to support this contention states:
 "*Nuisance—Definition.*—A nuisance consists in unlawfully doing an act or omitting to perform a duty, which act or omission:
 "1. ...
 "2. Offends decency;
 "3. ...
 "4. ..."

17. Section 42–01–06, N.D.C.C., states:
 "*Public nuisance—Definition.*—A public nuisance is one which at the same time af-

and Ordinance No. 2337 were not enacted in violation of Section 12.1–27.1–12, N.D.C.C.[15]

## NUISANCE

In count No. 2 of the complaint in the action which precipitated this appeal, the Minot chief of police, as relator under the State nuisance laws, alleges that Central uses its adult entertainment center to display and sell obscene material and therefore the adult entertainment center constitutes a nuisance in general under Section 42–01–01, N.D.C.C.,[16] and particularly a public nuisance under Section 42–01–06, N.D.C.C.[17] In his prayer for relief, Chief Erickson asked the trial court:

"5.

"For a permanent injunction against all of the defendants, limited as required by considerations of the 1st and 14th Amendments to the United States Constitution and Section 9 of the State of North Dakota Constitution, closing the premises for a period of 1 year pursuant to NDCC 42–02–04, subject to property owner's rights under NDCC 42–02–06."[18]

fects an entire community or neighborhood or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal."

18. Section 42–02–04, N.D.C.C., states:
 "If a place is found, upon the judgment of a jury, court, or judge having jurisdiction, to be a common nuisance, the sheriff, his deputy, or any constable of the proper county, or the police or marshal of any city or village where the nuisance is located, shall be directed to close and abate such place by taking possession thereof, together with all personal property used in keeping and maintaining such nuisance, and to close the same against use by anyone, and to keep it closed for a period of one year from the date of the judgment decreeing it to be a common nuisance. After judgment, such officer publicly shall destroy such personal property used in keeping and maintaining the nuisance. Any person breaking open said building, erection, or place, or using the premises so ordered to be closed, shall be punished for contempt as provided by this chapter."
 Section 42–02–06, N.D.C.C., states:
 "*Termination of lease by owner under injunction releases property—Notice to tenant.*—When leasehold premises are closed

In its judgment, dated October 6, 1980, the district court, having relied in its memorandum opinion on the First Amendment doctrine of prior restraint, dismissed the second count of the complaint because it failed to state a claim upon which relief may be granted. In the cross-appeal brought by Minot and Chief Erickson we are asked to decide whether or not the dissemination of obscene material is an activity susceptible of regulation under Title 42, *Nuisances*, N.D.C.C.

At the outset of our consideration of this issue we point out that an action to restrain a nuisance is an equitable proceeding and a court of equity has jurisdiction to restrain a nuisance even though the act sought to be restrained is criminal and punishable under this State's penal laws. *State v. Hooker*, 87 N.W.2d 337 (N.D. 1957). Thus the fact that dissemination of obscene material in this State is punishable under Section 12.1–27.1–01, N.D.C.C., is not an obstacle in our consideration of the present issue. In addition, we are aware of no requirement that States are obligated to enact special statutes establishing procedures exclusively for use in cases which involve First Amendment rights. This is pointed out to illustrate that certain action taken by the North Dakota Legislature subsequent to the district court's judgment in this action has no bearing on our consideration of this issue.[19]

The question of whether or not the dissemination of material which has been found to be obscene constitutes a nuisance under Section 42–01–01, N.D.C.C., must be answered before we determine whether or not such dissemination may be enjoined under Section 42–02–02, N.D.C.C., or made the subject of abatement under Section 42–02–04, N.D.C.C.

We believe that the root of the answer to the question of whether or not the dissemination of obscene material is a nuisance is embedded in *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). In *Paris*, the Supreme Court determined that States have a legitimate interest in regulating commerce in obscene material and its exhibition in places of public accommodation, including adult entertainment centers. A remark made by the Court may be related directly to Section 42–01–01(2), N.D.C.C.:

> "The States have the power to make a morally neutral judgment that public exhibition of obscene material, or commerce in such material, has a tendency to injure the community as a whole, to endanger the public safety, or to jeopardize, in Mr. Chief Justice Warren's words, the States' 'right . . . to maintain a decent society.' [Citation omitted.]" 413 U.S. at 69, 93 S.Ct. at 2641, 37 L.Ed.2d at 464.

under an injunctional order or have been adjudged to be a nuisance, the owner thereof shall have the right to terminate the lease by giving three days' notice thereof in writing to the tenant, and after giving such notice, if the owner shall prove to the court that he was without fault, and had not knowingly nor negligently permitted the keeping or maintaining of the nuisance complained of, the premises shall be turned over to the owner upon the order of the court. The release of the property shall be upon the condition that the nuisance shall not be continued and that the return of the property shall not release any lien upon said property occasioned by any prosecution of the tenant. If the owner appears and pays all costs of the proceedings and files a bond with sureties to be approved by the court, conditioned that he immediately will abate said nuisance and will prevent it from being established or kept therein within the period of one year thereafter, the court or

the judge, if satisfied of the owner's good faith, may order that the premises taken and closed be released and the said order of abatement canceled so far as it may relate to said property."

19. The 47th Legislative Assembly repealed Sections 12.1–27.1–04 through 12.1–27.1–10, N.D. C.C. See S.B. 2238. The repealed sections included special statutes providing for the procedures to be followed in obtaining the civil determination of obscenity required before a criminal conviction for violation of the Obscenity Control Act could be sought. Among these special statutes were Sections 12.1–27.1–08 and 12.1–27.1–09, which provided for the issuance of permanent and preliminary injunctions against the dissemination of materials subject to the provisions of the Obscenity Control Act.

In *Paris*, the Court expressly approved Georgia case law which upheld civil injunctions regarding the exhibition of obscene material. Among the cases considered was *Evans Theatre Corp. v. Slaton*, 227 Ga. 377, 180 S.E.2d 712 (1971), wherein the Supreme Court of Georgia, recognizing that the State has an interest in the welfare, peace, and good order of its citizens and communities, concluded that the exhibition of obscene material to consenting adults in an adult theater is contrary to the standards of decency and propriety of the community as a whole and may be enjoined as a nuisance. The Supreme Court of the United States in *Paris, supra*, approved of the Georgia procedure and elaborated:

> "While this procedure is civil in nature, and does not directly involve the state criminal statute proscribing exhibition of obscene material, the Georgia case law permitting civil injunction does adopt the definition of 'obscene materials' used by the criminal statute." 413 U.S. at 54, 93 S.Ct. at 2633, 37 L.Ed.2d at 455.

The Supreme Court went on to point out that on the same day it was deciding *Paris* it had decided *Miller v. California, supra*, wherein a new standard for determining obscenity was set forth. The Court remanded the obscenity issue in *Paris* to be reconsidered in light of *Miller*. However, the Court stressed that the remand was not to be taken as a sign it disapproved of the Georgia procedure:

> "This is not to be read as disapproval of the Georgia civil procedure employed in this case, assuming the use of a constitutionally acceptable standard for determining what is protected by the First Amendment. On the contrary, such a procedure provides an exhibitor or purveyor of materials the best possible notice, prior to any criminal indictments, as to whether the materials are unprotected by the First Amendment and subject to State regulation. [Citation omitted.] Here, Georgia imposed no restraint on the exhibition of the films involved in this case until after a full adversary proceeding and a final judicial determination by the Georgia Supreme Court that the

materials were constitutionally unprotected. Thus the standards of [prior United States Supreme Court decisions] were met." 413 U.S. at 55, 93 S.Ct. at 2634, 37 L.Ed.2d at 455.

Thus, provided adequate constitutional safeguards are present, there exists no principle of law which prohibits States from regulating, through the use of their nuisance laws, the dissemination of obscene material.

 The same conclusion we reach today regarding the regulation of obscene material through the application of nuisance laws was reached by the Supreme Court of California in *People ex rel. Busch v. Projection Room Theater*, 17 Cal.3d 42, 130 Cal.Rptr. 328, 550 P.2d 600 (1976). In *Busch*, the court considered the challenge raised by the defendants that the use of public-nuisance statutes to enjoin or otherwise abate the exhibition of films and magazines violates the constitutional principle against prior restraint of presumptively protected materials. The California court noted, as we have earlier in this opinion, that prior restraints are not unconstitutional per se, and that they may be constitutionally sound if they are brought about with the use of procedural safeguards which exist to shield against the dangers of a censorship system. *Southeastern Promotions, Ltd. v. Conrad, supra*. In *Southeastern*, the Supreme Court identified these safeguards:

> "First, the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. Second, any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. Third, a prompt final judicial determination must be assured." 420 U.S. at 560, 95 S.Ct. at 1247, 43 L.Ed.2d at 460.

 As did the California Supreme Court in *Busch, supra*, we have reviewed the forms of relief sought by Minot under this State's nuisance laws in order to determine whether or not they may be applied to

regulate obscene material in such a way as to accommodate the safeguards enumerated above. We are satisfied that, as applied to specific materials, under the procedures and remedies available within this State's nuisance laws, a determination of obscenity may be made and the specific material adjudged obscene may be the subject of an injunction prohibiting its further dissemination. However, we are unable to arrive at the same conclusion where the form of relief sought is, pursuant to Section 42–02–04, N.D.C.C., the closing for one year of the establishment from which the particular obscene items were disseminated. We believe that such a remedy would constitute an impermissible prior restraint upon freedom of speech. Closing for a year of an establishment to prevent the dissemination of material therein which has not been adjudged to be obscene flies squarely in the face of the constitutional safeguards necessary to support a valid prior restraint. A determination that because one or two items being disseminated from an establishment are obscene, all of the items within the establishment may be prohibited from being disseminated, cannot be reconciled with the long-standing constitutional safeguards surrounding free speech. See *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

The record in this case indicates that Minot and Chief Erickson sought, through their complaint and prayer for relief, to have the trial court determine: (1) that the dissemination of specific material which was before the trial court constituted a nuisance and that Central should be enjoined from distributing that material; and (2) that upon such a determination, Central's adult entertainment center should be closed for one year under Section 42–02–04, N.D.C.C. We have determined that, provided certain constitutional safeguards are present, it is permissible for a trial court in this State to make the determination sought regarding specific material. We now also conclude that such a determination alone will not constitutionally support the closing for one year of the establishment from which the material is dispensed unless other circumstances justifying a one-year closing exist. The trial court apparently believed that this latter issue represented Minot and Erickson's ultimate goal and was the one which warranted a special ruling. Thus in its memorandum opinion, while generally recognizing the case law which supports the use of nuisance laws to determine the existence of and enjoin the distribution of specific obscene materials, the trial court proceeded to its conclusion that Section 42–02–04, N.D.C.C., could not be used to close the adult entertainment center:

" . . . none of the material involved in this present case has been declared to be obscene pursuant to North Dakota law, nor was the purpose of this present case to do so."

In light of our conclusion that this State's nuisance laws may be used to determine and enjoin the distribution of specific obscene material, we believe that the trial court should have considered the particular items before it and made a ruling as to their status as obscene or not obscene material. Therefore, we remand that issue to the trial court for such a determination.

In all other respects, except for our determination regarding the permissible scope of the disclosure requirement in Ordinance No. 2337, which is severable from the remaining provisions of the ordinance, the judgment of the trial court upholding the ordinances is affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.